## William Meenehan, Appellee, v. Morris S. Rosenfield and Mark W. Walton, Appellants.

### Gen. No. 29,239.

1. FRAUD AND DECEIT—*necessity of direct causal connection between alleged fraud and damages to make fraud actionable.* In an action for fraud and deceit, to entitle plaintiff to recover damages there must be a relation of cause and effect between the misrepresentations and the damage, and the damage must be the legal and natural consequence of the wrong complained of, proceeding exclusively from that and not from other causes.

2. FRAUD AND DECEIT—*when actionable fraud not shown by evidence.* Where plaintiff's failure to succeed in the operation of bakeries in which he used electric ovens purchased from defendants was due, as shown by the evidence, to an insufficient volume of business, misrepresentations made by defendants in selling the ovens as to the amount of money invested in the oven business; as to defendants' control of patents on the oven; as to the ovens being sold at cost and the collection of royalties from other customers; and that defendants had a purchasing organization which could purchase bakers' supplies below the market price, were unrelated to the cause of plaintiff's losses and furnish no ground for the recovery of damages in an action for fraud and deceit, it appearing that plaintiff was in fact given the exclusive right

to operate the ovens in the territory agreed upon, and no claim being made that the ovens were defective or did not fully comply with the requirements of the contract.

Appeal by defendants from the Circuit Court of Cook county; the Hon. EDWARD D. SHURTLEFF, Judge, presiding. Heard in the first division of this court for the first district at the March term, 1924. Reversed and remanded. Opinion filed January 26, 1925.

MERGENTHEIM, ALTHEIMER & MAYER, for appellants; MORTON A. MERGENTHEIM, of counsel.

DAVID K. TONE, for appellee.

MR. PRESIDING JUSTICE McSURELY delivered the opinion of the court.

This is an action for fraud and deceit, in which plaintiff charged that defendants entered into a conspiracy to sell him electric ovens and outfits and induced him by false representations to sign a contract for such purchase, thereby causing him damages. Upon trial he had a verdict for $33,833. From the judgment thereon defendants appeal.

In July, 1919, defendant Rosenfield was president and Walton treasurer of the Keeps-Fresh Electric Bakeries, an Illinois corporation. The company was engaged in selling ovens for baking bread, rolls and pastry. The ovens were manufactured for the company by the Edison Electric Appliances Company, which was making a type of oven containing certain patented features, one being the Marsh patent, whereby, through chromium wire coils, uniform heat could be maintained in the ovens. By agreement between the manufacturing company and the Keeps-Fresh Company the former agreed to manufacture a special oven for the Keeps-Fresh Company embodying these patented features and also certain distinctive features, such as glass doors, special white porcelain covering and nickel-plated parts. This special type was to be known as the Keeps-Fresh oven and

the manufacturing company agreed not to make this particular style of oven for any others than the Keeps-Fresh Company. In August, 1919, plaintiff, who resided in Philadelphia, met Sanford Jacobi, a salesman of the Keeps-Fresh Company, who interested plaintiff in these ovens, and, it is said, made certain representations concerning them, which are the alleged misrepresentations upon which this action is based; they are hereinafter stated. Subsequently Jacobi and plaintiff met in Chicago, and after plaintiff had seen several of the Keeps-Fresh ovens in operation they went to the office of the company where, plaintiff says, they met defendants Rosenfield and Walton. Plaintiff testified that at this time Rosenfield and Walton affirmed and repeated the representations made by Jacobi. Rosenfield denies that he was present at such interview, and in this he is supported by both Walton and Jacobi. Rosenfield testified that he never had seen plaintiff before the time of the trial. Persuaded by these representations, plaintiff says, he then signed a contract dated August 25, 1919, for the purchase of three ovens and outfits. About two weeks thereafter plaintiff met Jacobi in Philadelphia and there signed a contract for an additional seventeen ovens. Before this second contract was signed plaintiff took Jacobi to see plaintiff's banker, to whom Jacobi explained the situation. They also submitted the first contract to plaintiff's Philadelphia lawyer who examined it and told plaintiff that it was all right. Later the contracts for three ovens and seventeen ovens were merged into one contract, dated September 12, 1919, for twenty ovens, which contained all the conditions of the contract for seventeen ovens. The last contract, which describes in detail the ovens and the equipment to be furnished, was referred to as ''bakery outfit.'' The Keeps-Fresh Company agreed to sell and plaintiff agreed to buy these twenty ovens for $5,000 each, payments to be made in certain instalments. The Keeps-Fresh Company agreed to sell

Meenehan v. Rosenfield et al., 236 Ill. App. 4.

such outfits to no other party in Philadelphia. Plaintiff agreed to order said twenty outfits at the rate of at least one outfit a month for installation until the twenty outfits had been ordered out. Plaintiff also agreed to pay the company as long as the outfits were in operation a sum equal to 2 per cent of the gross receipts from all articles sold by him. Plaintiff could cease to operate said bakery outfits at any time, but he agreed not to sell them except to a purchaser who would agree not to operate them in other territories without the company's consent. Plaintiff also agreed not to operate these ovens in any other territory than Philadelphia without the company's consent. The company agreed to use due diligence in installing its bakery outfits, and gave plaintiff an option to purchase additional outfits to be placed in other locations, the company agreeing to grant no similar option to any other party. The contract also provided that $39,500 should be paid by plaintiff to carry out the conditions of the agreement, and that this sum or any part thereof remaining in the hands of the company should be forfeited as liquidated damages in case of default of plaintiff.

Up to June, 1920, plaintiff had ordered out five outfits and apparently the business had not prospered as he had expected. Negotiations were had with reference to the company waiving some of its rights under the contract and for extension of time for plaintiff to make payments. Various interviews and correspondence were had with Walton and another officer of the company, who advised plaintiff in the matter.

In February, 1920, plaintiff was short of funds, and in compliance with his request the company agreed to accept chattel mortgage notes for the next five bakery outfits called for by the contract. Plaintiff again asked for leniency, saying that if he did not get help he would cancel some of his leases. His letters during the spring of 1920 are to the effect that he was

not making sufficient money. There was much correspondence having to do with the payments due from plaintiff and provisions for taking care of the same. Plaintiff stopped paying the 2 per cent royalty in May, 1920, although as late as June 14 he was still trying to open a bakery. He paid no attention to letters written to him in June and July by the company, demanding that he fulfill the terms of his contract. July 27 he asked for information concerning the electric power of the oven for a new store. August 23 the company, having received no reply to its recent letters, wrote threatening to retain the money deposited with it as liquidated damages. To this plaintiff replied by letter dated August 26, 1920, saying that he felt that the matter could be adjusted and "our relations can be continued pleasant if we can meet and discuss the situation." There is nothing in this letter about any alleged misrepresentations, although plaintiff testified that it was in the previous May that he had visited his lawyer to talk with him about the representations made when he signed the contract.

November 29, 1920, plaintiff filed a bill in chancery seeking to have his contract annulled, and after taking some testimony before a master the bill was dismissed. This lawsuit was commenced December 3, 1920. In the first declaration filed plaintiff alleged that subsequent to June and in August, 1920, he discovered that all of the representations made by defendants to induce him to enter into the contract were false and untrue. When the case was tried in November, 1923, upon the introduction of his letter of August 26, 1920, in which nothing was said about misrepresentations, but suggesting that the relations might be continued pleasant, plaintiff was permitted to file an amended declaration, in which he alleged that it was in the latter part of September, 1920, that he discovered the representations were untrue.

The alleged representations above referred to, which it is said were fraudulently made for the purpose of inducing plaintiff to purchase the ovens, were that Rosenfield was a wealthy man and had invested a million dollars in the Keeps-Fresh Company; that the company owned and controlled United States patents on the electric ovens sold by it; that it owned a valuable factory where it made its ovens; that it collected royalties from its customers on such patented ovens; and that it had a purchasing organization whereby it could purchase flour and other bakery supplies below the market price for its customers.

This case is apparently very complicated, caused largely by the extended argument of the facts and law thought to be necessary to be considered. Most of the argument is concerned with the words said to be used by defendants or their agent, Jacobi, defendants' counsel contending that they were not in the nature of representations as to existing facts or conditions, but merely words and phrases used in "puffing" goods offered for sale. Analysis of the circumstances of the parties and the language used strongly persuades that the representations made are not such as to furnish a basis for an action of fraud and deceit; but we prefer to base our conclusion upon another controlling point. We hold that the judgment cannot stand for the reason that there is an utter lack of proof of any causal connection between the alleged misrepresentations and the damage suffered by plaintiff.

"To entitle a person to maintain an action for false and fraudulent representations or concealment, it is not enough to show merely that he has been damaged, but it is also necessary to show that the fraud was the cause of the damage. And further than this, it is necessary that the fraud shall have been the direct and proximate cause of the damage, and not a remote cause, and that the damage shall be clearly defined and ascertained." 14 Amer. & Eng. Encyc. of Law, p. 144.

"Fraud and injury must concur to furnish a ground for judicial action. In an action for fraudulent representations the plaintiff must not only show that the representations were made, and that they were false and fraudulent, but he must also show affirmatively that he has been injured thereby." *Jones v. Foster,* 175 Ill. 459, and cases there cited.

In action of this sort the plaintiff must show affirmatively that he is in some way in a worse condition than he would have been had the representations been true. *Bartlett v. Blaine,* 83 Ill. 25; *Wenegar v. Bollenbach,* 180 Ill. 222. There must be a relation of cause and effect between the misrepresentations and the damage and the damage must be the legal and natural consequence of the wrong complained of, proceeding exclusively from that and not from other causes.

"The law requires that the injury must proceed so directly from the wrongful act that according to common experience and the usual course of events it might, under the particular circumstances, have reasonably been expected." *Jex v. Straus,* 122 N. Y. 293.

Especially applicable to the instant case is the language in *Tregner v. Hazen,* 116 N. Y. App. Div. 829:

"This record suggests no reason to think that the plaintiff would have succeeded any better if the representation relied on had been true. Much less does it show to what extent the failure was due to the alleged fraud. The cause of the failure is left entirely to speculation except as it may be inferred from the revelation of the plaintiff himself by his own letters. The mere fact that one party has been guilty of wrongdoing does not give the other a cause of action for damages unless as the result of such wrongdoing he has sustained damages."

"It must be shown not only that the defendant has committed tort, and the plaintiff has sustained damage, but that the damage is the clear and necessary consequence of the tort, and such as can be clearly defined and ascertained." *Dawe v. Morris,* 149 Mass. 188.

Where no connection is shown between the misrepresentation alleged to have been made and the damages claimed there can be no recovery. *Clark v. East Lake Lumber Co.,* 158 N. C. 139. In *Morgan v. Hodge,* 145 Wis. 143, plaintiff sought to maintain an action for conspiracy and false representations where the essential circumstances are similar to those in the instant case. In holding that the judgment for the plaintiffs should be reversed the opinion says,—whether the alleged representations were true **or** false:

"There was just as good a prospect of the business being profitable in one case as in the other. So far as the evidence throws light on the situation, it does not with any certainty indicate that the act of concealment in question was the proximate cause of the plaintiff's money loss. It certainly was not the cause of the unsatisfactory business done by the new firm, and it did not render them incapable of meeting their obligations."

The plaintiffs there had apparently no property except what they put into the business and had loaded themselves with what seemed to be an impossible debt with resulting bankruptcy, and the opinion continues:

"But to say that the plaintiff's loss resulting from this is chargeable to the act of concealment complained of is to indulge in mere conjecture. The conclusion is too remote from the premise; there are too many substantial and sufficient causes between." 145 Wis., p. 150.

Other cases so holding are *Silver v. Frazier,* 3 Allen (85 Mass.) 382; *Marshall-McCartney Co. v. Halloran,* 15 N. D. 71, 106 N. W. 296; *Jamison v. Ellsworth,* 115 Iowa 90, 87 N. W. 723; *Smith v. Bolles,* 132 U. S. 125.

The cases cited by plaintiff on this point would be applicable to misrepresentations as to the construction, materials, fitness or capacity of the ovens, and where lack in these respects caused the buyer loss. A typical case cited is *Horne v. Walton,* 117 Ill. 141,

where it was falsely represented that a note was secured by a mortgage. The representations here are not of this character. Plaintiff received the ovens and outfits as ordered and operated them, and there is no claim that they were defective or in any way otherwise than as represented; they fully complied with the requirements of the contract.

The test therefore is, would plaintiff's business have been any better or his subsequent condition different from what it was if these representations had been true? The answer must be in the negative. The evidence shows that the cause of his ill success and of his failure to meet his obligations was poor business, which might have been caused by a variety of things, such as poor locations, insufficient advertising, ill health, incompetent employees, and a whole list of similar causes which tend to failure in business. The fact that plaintiff did not have enough customers to make the business profitable was wholly unrelated to the alleged misrepresentations. Whether or not Rosenfield had invested a million dollars in the Keeps-Fresh Company, or that this company owned and controlled the patents on the appliances in the ovens, or that it owned a factory where the ovens were made, or that they were sold at cost, or that it had collected royalties from other customers, or that it had a purchasing organization which could purchase the supplies below the market price, is not shown to have had any causal connection with the amount of business done by plaintiff.

It is especially urged that the representations by defendants that they owned and controlled the patents connected with the oven and would give plaintiff an exclusive right to operate them in Philadelphia were material and their untruthfulness resulted in plaintiff getting less than he was led to believe he would get, in that he did not have this exclusive right. The evidence as to just what was represented on this

Meenehan v. Rosenfield et al., 236 Ill. App. 4.

point is obscure; defendants did not own or control the patents, although the oven sold by their company had some special features which the manufacturers had agreed would be made only for this company. So that it is difficult to determine definitely whether defendants in referring to exclusive rights were referring to this particular type of oven or to the right to use the ovens and patents.

But whatever may have been the representations in this respect, there is no evidence that any one else than plaintiff operated such ovens in Philadelphia, but there is definite and affirmative evidence that there were no such ovens operated in this city except those operated by plaintiff. Plaintiff, therefore, did occupy the territory exclusively and had every advantage from this condition as if his version of the representations had been made and they were true.

To say that his losses in the business are chargeable to any or all of these representations is to indulge in mere conjecture. The essential fact of causal connection must be proven by the greater weight of the evidence before plaintiff can recover. He has failed in this respect, and the judgment is therefore reversed and the cause is remanded.

*Reversed and remanded.*

MATCHETT and JOHNSTON, JJ., concur.