## FIRST NAT. BANK OF TEMPLE v. CONTINENTAL CASUALTY CO.*
### No. 8693.

Circuit Court of Appeals, Fifth Circuit.
Dec. 13, 1938.

*Rehearing denied Jan. 23, 1939.

Walker Saulsbury and Byron Skelton, both of Temple, Tex., for appellant.

Allen Wight and O. O. Touchstone, both of Dallas, Tex., for appellee.

Before HOLMES and McCORD, Circuit Judges, and DEAVER, District Judge.

## McCORD, Circuit Judge.

First National Bank of Temple, appellant, sued the Continental Casualty Company, appellee, upon a fidelity bond for losses alleged to have been sustained by reason of a series of dishonest acts committed by three of its employees, Surghnor, Davis, and Lastovica. This appeal is from a judgment resting upon an instructed verdict for the appellee.

The record discloses that the First National Bank in Temple was engaged in the banking business in Temple, Texas, and that on about September 22, 1933, it sold its assets to a new bank, First National Bank of Temple. The new bank assumed all existing liabilities of the old bank, and on September 23, opened its doors for business. The new bank retained three of the old bank's employees, Surghnor, Davis, and Lastovica, as cashier and tellers respectively.

On September 22, 1933, the appellee delivered to the new bank its Bankers Blanket Bond protecting it against the dishonest acts of any of its employees.

In this suit the appellant alleged ten items of loss, involving upwards of seventeen thousand dollars, and that the losses were sustained through the dishonest acts of its employees.

The evidence further shows that many of the items listed as loss were withheld deposit slips. That is, when a deposit was made it would not go down as a deposit on the books but would be "kited" from one account to another to cover shortage.

Arthur C. Upleger, an expert certified public accountant of long standing, an auditor possessing much experience in checking and making bank audits, was appointed by the court to make an examination of the accounts and condition of the affairs of this bank. He spent several months in and about this work; and being empowered by the court, called before him many witnesses who were sworn and testified. The confessions and admissions of the three bank employees and who had been convicted of "making false entries" were before Upleger and is a part of the evidence. Thereupon, he made to the court a detailed report of his findings which is in the record. He also testified, as was his right, as an expert, and his testimony is also a part of the evidence in this case.

Upleger testified, "A great many of the items are withheld deposit slips, others are cash items that were taken out. There was evidence of a great deal of 'kiting' in that they would withhold a deposit slip and either put in a deposit slip that had been previously withheld, or eventually would take out a cash item. * * * That is the commonest system used in a bank for covering shortages where the shortage goes over any length of time. * * * I found that it appeared from the evidence that I could secure, and from the testimony, that $5,577.51 was carried forward from the accounts of the old bank into the new bank; there was a shortage that apparently existed in the old bank that had come into the new bank. I found the remainder of the alleged shortage in the new bank."

Sam Davis, one of the employees involved, testified before Upleger as to his shortage: "I knew this was wrong, and that it was taking the bank's money. I didn't tell anybody because I didn't want anyone to know, and I would have lost my job. I was working under Mr. Surghnor; he was my superior officer. That is absolutely the only reason I did it. * * * It is a fact that I started out twelve months after the bank opened withholding two or three hundred dollars worth of checks, in the first batch; and then I withheld dozens of deposits, and would replace them from day to day, or week to week as was necessary to cover it up. * * *"

Appellant's witness, T. M. Glass, former National Bank Examiner, testified, "Mr. Surghnor turned over to me certain items, and said that constituted his shortage. * * *"

From the evidence this appears to be another case of inside bank plundering. It was defalcation in the same old way. It is as old as pain. The employees withheld deposit slips and by the system of kit-

310

ing covered their defalcations until the shortage became too big to hide.

■ Unquestionably, the bonding company cannot be held for any loss not sustained within the effective period of its bond. But where there were shortages in the predecessor bank, and the employees there took money and afterwards came into the new bank as employees and covered their defalcations in the old bank by taking the money of the new bank, the bonding company would be liable. Royal Indemnity Co. et al. v. North Texas Nat. Bank et al., Tex.Com.App., 34 S.W.2d 249; Ætna Casualty & Surety Co. v. First Trust & Savings Bank, 5 Cir., 62 F.2d 316; Western Indemnity Co. v. Free and Accepted Masons of Texas, Tex.Civ.App., 198 S.W. 1092; United States Fidelity &. Guaranty Co. v. Bank of Thorsby, 5 Cir., 46 F.2d 950.

■ The appellant did not show the exact time when the losses occurred. This was not necessary. "Embezzlers ordinarily operate secretly, and a surety may not escape liability under a bond such as this because the employer is unable to show the exact time and manner of the embezzlement." Fidelity & Deposit Co. of Md. v. People's Bank of Sanford, North Carolina, 4 Cir., 72 F.2d 932, 939.

■ We are mindful of the rule that where parties to an action both make unqualified motions for a directed verdict, the parties thereby submit to the court the determination of the inferences to be drawn from the facts, and his conclusion of fact must stand, if supported by any substantial evidence. Cases cited under note 15, p. 439, 28 U.S.C.A. § 770. Here we have a case where the employees of the new bank, three of them, disclosed their shortage and defalcations while they worked for the new bank. Moreover, they have disclosed how, from time to time, they covered deposits that came over from the old institution into the new bank. This went on until it could no longer be hidden. It was the old story of plunder and pillage that finally came to light. The preponderance of the evidence points to the guilt of the employees of the new bank. we are constrained to hold, after a careful consideration of all the evidence, that the trial court gave to the jury a directed verdict which was not supported by any substantial evidence. Massachusetts Bonding & Ins. Co. v. Hudspeth, 8 Cir., 94 F.2d 467.

Considering all of the evidence, we are of opinion that the court committed error in instructing the verdict for the appellee, and that the case should have gone to the jury for its determination.

The judgment is reversed and the cause is remanded for proceedings not inconsistent with this opinion.

Reversed and remanded.