Hamilton Watch Company, Appellee, v. George W. Borg Corporation, Appellant.

Gen. No. 42,189.

Opinion filed December 30, 1942.. Rehearing denied January 20, 1943.

SAMUEL R. KENWORTHY, of Moline, and G. A. SHALLBERG and EDMUND D. ADCOCK, both of Chicago, for ap-

pellant; JOHN W. DAY and ELI E. FINK, both of Chicago, of counsel.

FRANK R. REID, of Chicago, for appellee; BARNES, RICHARDSON & COLBURN, of New York City, Charles A. O'CONNOR, of Aurora, and FRANK REID, JR., of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

Hamilton Watch Company of Lancaster, Pennsylvania, brought suit against the George W. Borg Corporation of Chicago for the alleged breach of an agreement by defendant to reimburse plaintiff for a specific import duty, in the event plaintiff should be called upon by the United States Customs to pay it, on certain colleted hairsprings imported by plaintiff from Switzerland during the years 1934–37, which plaintiff sold to defendant for use in the manufacture of automobile clocks. The complaint consisted of three counts, one claiming the sum of $137,060.58, another $68,530.29, and the third $173,234.17, all based on the same facts. The motion judge of the circuit court dismissed Counts I and III on defendant's motion and thereafter, by leave of court, plaintiff filed an amended complaint containing substantially the same allegations as were embraced in Count II, asking judgment for $68,530.29. The case was tried upon the amended complaint, answer, special defenses and plaintiff's replies. At the close of the case the trial court, on motion of plaintiff and over defendant's objection, reinstated Counts I and III, and entered the judgment for $200,536.52, which represented the sum of $173,-234.17 paid to the customs officials in full settlement of all duties, fines and penalties demanded by the government, plus interest, from which defendant appeals.

No oral testimony was adduced upon trial, the evidence, except for two physical exhibits, being entirely

documentary and consisting principally of correspondence between the parties. From the facts disclosed by the record it appears that prior to 1930 the Hamilton Watch Company had obtained an exclusive license to use and sell a patented hairspring, known as the Elinvar hairspring, manufactured in Switzerland, which was used in the manufacture of its own watches, and under the license agreement of April 11, 1930 it undertook to sell the Borg Corporation its Elinvar hairsprings from time to time in such quantities as it might require and at a price to be agreed upon. The agreement merely expressed the intention of the parties to enter into future business relations with each other, and no contractual obligations were imposed upon either party.

Under the stipulation of the parties the article involved in this case is described as a "colleted hairspring" or "hairspring with collet attached." It consists of two parts; one part is a hairspring and the other part is a collet or collar consisting of a small metal disc. When the hairspring is attached to the collet by means of closing together a slot in the collet, into which one end of the hairspring has been inserted, it is known as a colleted hairspring. Through the collet thus attached to the hairspring is a shaft or staff, upon which the spring operates to regulate the motion of the balance or vibrating wheel regulating the movement of the timepiece.

Following the execution of the agreement of April 11, 1930 defendant submitted purchase orders for colleted hairsprings which were accepted by plaintiff at fixed prices and deliveries were made accordingly. Prior to December 1934 hairsprings were imported by plaintiff from Switzerland, and then in this country with its own colleting machines plaintiff attached or joined together the hairspring and the collet, and sold them in that condition to defendant as colleted hairsprings. Numerous invoices delivered by

plaintiff to defendant, dated at various times from December 1931 to August 1933, were offered in evidence, showing the sales of colleted hairsprings at $11.45 per hundred. In September 1934 plaintiff advised defendant that because its colleting machines were fully occupied on plaintiff's own work, it would be unable to continue attaching the collets to the hairsprings. However, defendant relied on plaintiff for colleted hairsprings in the manufacture of its products and upon so informing plaintiff, the latter ascertained by cable that it could arrange to have the collets attached to the springs in Switzerland, and accordingly on October 2, 1934 advised defendant that the price of the hairsprings, with collets attached in Switzerland, would be the same as it had been when the collets were attached in this country by plaintiff. Following this correspondence plaintiff, December 5, 1934, made its first shipment to defendant of hairsprings which it had imported from Switzerland with collets there attached, at the price of $13.45 per hundred. This was apparently the first shipment of colleted hairsprings plaintiff had ever imported from Switzerland. From that date until February 6, 1935, six more shipments were made at the same price.

Beginning on March 22, 1935 there commenced the important correspondence between the parties which led to the subsequent agreement of April 8, 1935, upon which plaintiff's claim is predicated. Defendant had requested plaintiff to reduce the price of colleted hairsprings, which at that time was $13.45 per hundred. After the exchange of letters, the agreement of April 8, 1935, which proposed to reduce the price from $13.45 to $10.45 per hundred, was transmitted to defendant and accepted by confirmation in writing. The agreement is as follows:

"In accordance with our previous correspondence, and your letter of March 28th, 1935, we will give you a credit on the contract price of $13.45 per hundred for

hair springs of 3¢ each, thus in effect reducing the present cost to you from $13.45 to $10.45 per hundred, so long as the Customs Officials do not add a specific duty of 3¢ each for a 'sub-assembly.' We do this on the strength of your agreement to pay this company the 3¢ deducted as above if the Hamilton Watch Company is at any time called upon by the government to pay the specific duty.

"It is our understanding that the government may demand payment of this extra duty at any time; and your agreement to reimburse Hamilton for any sums for which it is determined this company is liable by reason of a claim for such specific duty. If you should desire to contest such claim, all costs and expenses in connection with any such contest or suit will be borne by your company.

"We are enclosing a copy of this letter, and would ask you to mark your confirmation on the original or copy, signed by the proper corporate officers with an impress of your seal, and return the signed copy to us. On receipt of this letter with your approval noted as suggested, we will issue a credit memorandum of 3¢ per unit for hair springs supplied you since October 1st, 1934, and will bill future orders at $10.45 instead of $13.45 per hundred."

Pursuant to this agreement plaintiff issued a credit memorandum reducing the price of colleted hairsprings sold prior to April 8, 1935 from $13.45 to $10.45 per hundred, and thereafter continued to deliver colleted hairsprings to defendant at the reduced price of $10.45 in accordance with the agreement. The first paragraph of the contract indicates that the parties entertained some doubt as to whether the customs officials would consider this mechanism as a subassembly and add three cents for each colleted hairspring as a specific duty, and in fact the reduction in the price was made by plaintiff because of defendant's undertaking to pay the three cents deducted for each col-

leted hairspring ordered and delivered in the event that plaintiff was "at any time called upon by the government to pay the specific duty." The second paragraph indicates that the parties recognized the government's right to demand the payment of extra duty at any time, and again reiterated defendant's obligation to reimburse plaintiff for any sums "for which it is determined this company is liable by reason of a claim for such specific duty," and at the same time conferred the right on defendant to contest, at its own expense, any claims made by the government. Defendant had on March 28, 1935, only 10 days before the agreement was executed, written plaintiff that "We hardly believe that the customs officials would hold these hair springs in the strict sense as a sub-assembly, inasmuch as certainly the collet is a component part of a hair spring," thus indicating that it shared plaintiff's views and entertained the same doubts as to whether the customs officials would rule the assembly as subject to a special duty.

The specific provision of the Tariff Act which evidently gave rise to the doubt entertained by both plaintiff and defendant as to whether the customs officials would consider colleted hairsprings as one piece, that is, whether the collet would be held to be a component part of the hairspring, or a subassembly thereof, and therefore two parts or pieces of material, each subject to a special duty of three cents, in addition to the 65 per cent *ad valorem* tax, is contained in paragraph 368 of the Tariff Act of 1930, title 19, U. S. C. A., section 1001, which, with respect to clock parts, reads: ". . . each assembly or subassembly . . . consisting of two or more parts or pieces of metal or other material joined or fastened together shall be subject to a duty of 65 per centum *ad valorem*, and, in addition, to a duty of 3 cents for each such part or piece of material . . . ."

Under the United States Customs Laws and Regulations, when an importer agrees to purchase articles from an exporter located in a foreign country, the latter is required to prepare an invoice of purchased merchandise, commonly called a consular invoice, on forms furnished by the American Consular Service, containing a detailed description of the merchandise and the name by which each item is known, and the exporter is also required to certify that all the statements in the declaration and invoice are true and correct. One copy of the consular invoice is then sent to the collector of customs at the port of entry named in the invoice, and an uncertified copy is given by the consular office to the exporter for delivery to the importer, who then presents it to the collector of customs at the port of entry. At the same time the importer is required to prepare and present to the collector of customs at the port of entry a document bearing a correct and accurate description of the articles imported.

Colleted hairsprings, such as were imported by plaintiff in the case at bar and sold to defendant, were subject to an *ad valorem* duty of 65 per cent, and in addition a duty of three cents for each of the two parts comprising the colleted hairspring. Simple clock hairsprings, on the other hand, without collets attached, were subject only to a 65 per cent *ad valorem* duty. The Customs Laws provide that if an importer enters any merchandise by means of fraudulent or false invoice or declaration or makes any false statement in the entry, such merchandise or the value thereof is subject to forfeiture, and that any importer who has incurred any fine, penalty or forfeiture may file with the Secretary of the Treasury a petition for a remission or mitigation of such fine, penalty or forfeiture, and for good cause the treasury may remit or mitigate the penalties imposed by the act.

In this case all the colleted hairsprings were declared as consisting of one part, which would have made them subject only to the 65 per cent *ad valorem* duty, with no additional special duty of three cents for each additional part. Under the Customs Laws "liquidation" is the final computation of the duties owing on an importation. In the absence of fraud, no entry can be reliquidated after the expiration of 60 days from the liquidation date appearing upon the entry documents, whereas in case of fraud the collector of customs may reliquidate an entry within two years after the date of liquidation. It thus appears that liquidation may take place at the instance of customs officials for any reason within 60 days, but after the lapse of this period reliquidation can be made by the government only for fraud, and that must be done within the two-year period.

In the case at bar all the colleted hairsprings imported by plaintiff and sold to defendant were the subject matter of 120 entries at the customs office at Philadelphia. Each importation was preceded by the execution of a consular invoice, indicating that the colleted hairsprings consisted of only one part and were therefore not subject to any specific duty. February 14, 1938, after all the colleted hairsprings involved in this litigation had been delivered, plaintiff advised defendant that it had just received notice from the customs that a number of invoices had been reliquidated. No specific duty had ever been charged prior to that date. Upon inquiry, defendant was advised by the customs on February 24, 1938 that the colleted hairsprings had been classified as a clock assembly, so that in addition to the duty of 65 per cent *ad valorem* there was a specific duty for each of the two parts thereof, making a specific duty of six cents for each colleted hairspring. Subsequently, on March 3, 1938, the collector of customs demanded of plaintiff the payment of (1) $14,-548.30 resulting from the reliquidation of certain entries by assessing a specific duty of six cents for

each colleted hairspring, and (2) $259,418.97, the penalty represented by estimated forfeiture value of colleted hairsprings for violation of the Customs Law; and the collector of customs accordingly demanded that plaintiff pay the government's aggregate claim of $273,967.27, resulting from the reliquidation of these entries. Part of this aggregate represented reliquidation, and the balance represented penalty as forfeiture value.

The following day, March 4, 1938, plaintiff wrote defendant that ''The Customs Officials are claiming duty as clock hairsprings, specifically subassemblies, at 65% *ad valorem* plus 6¢ specific duty, under par. 368, Tariff Act of 1930, on the watch hairsprings sold and shipped to you since 1934. Will you please advise us whether you wish to contest this classification in whatever form it may be raised by the government?'' In response to this letter defendant wrote plaintiff on March 9, 1938 that it was not a party to plaintiff's controversy with the government, and would not agree to contribute to or participate in the defense thereof. Being thus confronted with payment of the government's claim, plaintiff on March 30, 1938 filed with the collector of customs a petition for the remission or mitigation of penalties and forfeitures, in accordance with the suggestion of the customs officials, wherein plaintiff offered to pay in remission or mitigation of penalties and forfeitures the sum of $173,234.17. The commissioner of customs accepted the proffered sum in compromise of the penalty claim for the forfeiture value, and the suit at bar is brought to recover this amount, with interest, pursuant to the letter-agreement of April 8, 1935, wherein defendant agreed ''to reimburse Hamilton for any sums for which it is determined this company is liable by reason of a claim for such specific duty.''

By way of defense and as ground for reversal, defendant takes the position that it was induced to enter into the contract because of the fraudulent represen-

tations made by plaintiff that it had properly and accurately described the articles under the Customs Laws, and because of these misrepresentations and concealment of material facts the contract of April 8, 1935 was rendered void from its inception; that the agreement is void as against public policy if it must be construed as a contract to indemnify plaintiff as against demands of the government arising out of violations of the Customs Laws or fraud upon the customs in the importation of the articles in question; that although defendant undertook to reimburse plaintiff for the specific duty of three cents on certain colleted hairsprings, the sum paid by plaintiff to the government was a penalty or fine for fraudulent importations and was not in payment of any specific duty, wherefore defendant did not become obligated to pay plaintiff anything under the agreement: that in any event the maximum obligation of the defendant under the contract was to reimburse plaintiff for specific duty at the rate of three cents per colleted hairspring covered by the agreement, and since the government never called upon plaintiff to pay the specific duty on all the colleted hairsprings imported by plaintiff, but only upon a considerably lesser number of these articles, the amount of the judgment is clearly excessive and not in accordance with the agreement of the parties.

With respect to the first of these defenses it is argued that defendant did not know, nor was it apprised until this controversy arose in 1938, that plaintiff had been importing the colleted hairsprings by improperly describing them as hairsprings, and that plaintiff's letter of March 25, 1935, in which defendant was advised that the customs officials were considering the question whether the two pieces would be treated as a subassembly, amounted to a false representation; and it is asserted that defendant did not know until after all this merchandise had been ship-

ped and delivered to it that plaintiff had been mis-describing the articles as hairsprings instead of colleted hairsprings or hairsprings with collets attached. Because of these circumstances it is argued that plaintiff was guilty of such fraud as to nullify the agreement of the parties. There can be no doubt that plaintiff and defendant both entertained doubts as to whether the customs officials would hold that these hairsprings consisted of one or two separate pieces. The correspondence that passed between the parties, and indeed the contract itself, clearly indicate that they were of the same mind with respect to the classification of these articles, and the provision in the contract for the reduction of the price thereof was expressly made in anticipation of and conditioned upon the decision of the customs officials not to add a specific duty of three cents each for the "subassembly." Moreover, as shown by the second paragraph of the agreement, the parties knew "that the government may demand payment of this extra duty at any time," and therefore plaintiff provided for defendant's undertaking to reimburse plaintiff for any sums which might later be assessed for specific duty. These considerations were the primary object of entering into the agreement, for without these provisions the reduction in the price of the colleted hairsprings, and the credit memorandum given defendant for those purchased prior to April 8, 1935, would have been meaningless.

With respect to the contention that the contract is void as against public policy if it must be construed as an agreement to indemnify plaintiff against demands of the government arising out of violation of the Customs Laws for fraud upon the customs in the importation of the articles in question, there is nothing in the agreement requiring either party to defraud the government in carrying out the terms of the agreement. It was not an indemnity against any act which

was illegal or with respect to which the parties had any illegal purpose or intention. Moreover, there is no proof of fraud on the part of plaintiff in its dealings with defendant or with the government. After all the colleted hairsprings had been delivered to defendant, the customs officials under the Tariff Act ruled these hairsprings to be a subassembly within the meaning of the act, but they did not find that there was a fraudulent misrepresentation on the part of plaintiff in declaring them otherwise. Under the agreement defendant had the privilege of contesting any claim made by the government, had it so desired, but it declined to do so. We are therefore of opinion that the compromise of the government's claim by plaintiff did not have the effect of releasing defendant from its obligation to reimburse plaintiff within the provisions of the contract.

However, we are in accord with defendant's contention that its maximum obligation under the agreement was to reimburse plaintiff for specific duty at the rate of three cents per colleted hairspring covered by the agreement, and that the trial court erred in entering judgment for the full amount of the compromise payment made to the government, which included penalty and forfeiture charges. The motion judge evidently entertained this view of the litigation and struck Counts I and III, which were predicated on the theory that defendant was obligated to reimburse plaintiff for whatever it paid the government. Count II, upon which the parties went to trial, merely claimed three cents specific duty on each of the 2,284,343 colleted hairsprings sold and delivered by plaintiff to defendant, aggregating $68,530.29. Evidently plaintiff originally claimed no more than that sum, for in its letter to plaintiff, dated May 26, 1938, defendant's counsel said that their client had referred to them "its files pertaining to your alleged claim of $68,530.39 as additional charge of three cents per hairspring furnished

by your company,'' and in its response, dated June 1, 1938, plaintiff did not indicate that its claim was for more than that sum. It was only upon the filing of the suit that plaintiff asked for more, and when the motion judge dismissed Counts I and III, it immediately filed an amended complaint limiting its demand to $68,530.29, and, abandoning Counts I and III, went to trial under the amended and limited complaint.

Of course defendant does not concede that it is indebted to plaintiff for any sum whatsoever because of the special defenses interposed, and its counsel say that in any event defendant is only liable, under its agreement, to repay three cents per hairspring on the 50,941 articles sold to it prior to April 8, 1935, and 74,000 hairsprings on order on that date, or a total of 124,941 hairsprings. We do not think the contract is susceptible of this construction. When in March 1935 defendant asked for a reduction in the cost of the hairsprings, plaintiff pointed out that there were several factors which might offer an opportunity to reduce the cost, namely, (1) revaluation of the Swiss franç, (2) reductions in cost from plaintiff's supplier, and (3) favorable reviewing of duty requirements. Ultimately the reduction in price was made and the reduction arrived at in the agreement was evidently the solution reached by the parties, and was contingent upon the favorable review of duty requirements. If there could be any doubt as to the meaning of the contract, the intention of the parties can readily be ascertained from the correspondence which led to the execution thereof. It was a continuing contract which remained in force and effect until all the hairsprings ordered by defendant had been delivered, and its plain meaning is that the reduction should affect all purchases made during the life of the contract, upon the conditional consideration for reimbursement in the event of an adverse review of duty requirements by the customs officials. The last sentence of the contract

credits defendant with three cents per unit for the hairsprings supplied since October 1, 1934, and undertakes to "bill future orders at $10.45 instead of $13.45 per hundred."

There remains the question of whether defendant is liable for interest on the amount held to be due under the contract. Defendant argues that interest allowed without agreement does not apply where the amount to be recovered depends upon which of several constructions might be placed upon the instrument on which suit is brought, and its counsel say that assuming the contract is valid and that defendant is liable for some amount, then the extent of defendant's liability may be measured by a number of different theories of liability which are set forth in their brief; and they argue that since the damages are not liquidated or of such a nature as to be the subject of computation, interest on the judgment may not be allowed. The reason for the rule contended for is set forth in one of the cases cited by defendant, *Sterling-Midland Coal Co. v. Great Lakes Coal & Coke Co.*, 266 Ill. App. 46, as follows: ". . . where the damages are neither liquidated nor subject to exact computation, [the party against whom recovery is sought] is not able to ascertain the exact amount which is due and therefore is not able to make a tender of the same." However, in the case at bar plaintiff in May 1938 made a demand on defendant for the sum of $68,530.29. This was before the complaint was filed on November 16, 1938, and defendant could have tendered that definite sum and thus have been released from liability for any interest thereon, but instead it chose to ignore plaintiff's demand. Under the agreement of the parties defendant's obligations to reimburse plaintiff became definite and fixed when plaintiff paid the government. Of course the defendant took the position that it was not obligated for any sum whatsoever, but the plain import of the contract did

not warrant such a construction, and the mere fact that defendant interposed a defense does not absolve it from the obligation to pay interest. In numerous cases cited by plaintiff defenses were made in apparent good faith. In *Smith v. Gray,* 316 Ill. 488, the court, after reviewing the authorities, held that the ''cases are to the effect that upon all such instruments in writing, including building contracts, interest is payable after the money becomes due according to the terms of the contract and after it has been substantially performed, even where the amount due is not stated in the writing and is undetermined. If the plaintiff . . . is entitled to recover under the facts as finally established, there can be no question of his right to recover interest from the time of the demand on defendant and the wrongful refusal of the defendant to make settlement.'' In *Peoria Malting Co. v. Davenport Grain & Malt Co.,* 68 Ill. App. 104, defendant contended that interest was not allowable except as a penalty for vexatious and unreasonable delay, but the court held that ''The question whether there was vexatious and unreasonable delay in the payment of the money need not be considered by us, as we hold interest can be recovered under the written contract.''

For the reasons stated the judgment of the circuit court is reversed, and since there is no dispute as to the facts and no useful purpose would be served by remanding the case, which was tried by the court without a jury, judgment is entered here in the sum of $68,530.29, together with interest thereon from the date of the demand for that sum by plaintiff in May 1938, at the rate of 5 per cent per annum.

*Judgment reversed and judgment here.*

SULLIVAN, P. J., and SCANLAN, J., concur.