CENTRAL NATIONAL CHICAGO CORPORATION *et al.*, Plaintiffs-Appellees, Cross-Appellants, *v.* LUMBERMENS MUTUAL CASUALTY COMPANY, Defendant and Counterplaintiff-Appellant, Cross-Appellee.— (INDIANA INDUSTRIES INCORPORATED *et al.*, Defendants and Counterdefendants-Appellees.)

First District (3rd Division)   No. 62236

Opinion filed January 11, 1977.—Rehearing denied February 9, 1977.

---

[1]See *People v. Pruitt* (1976), 44 Ill. App. 3d 161.

Edward D. Lapperre and Vincent P. Reilly, both of Chicago, for appellant.

Gerald A. Ambrose, Theodore A. Groenke, and Robert J. Lepri, all of Chicago (Sidley & Austin and McDermott, Will & Emery, of counsel), for appellees.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

Plaintiffs, Central National Chicago Corporation, a Delaware corporation (Central National), and Rawleigh, Moses & Co., Inc., a Delaware corporation (Rawleigh, Moses of Delaware), brought this action to recover on an insurance contract issued by defendant Lumbermens Mutual Casualty Co., an Illinois corporation (Lumbermens). Plaintiffs also brought an action against Indiana Industries, Incorporated, an Indiana corporation (Indiana Industries) and Rawleigh, Moses & Co., Inc., an Indiana corporation (Rawleigh, Moses of Indiana) for alleged breach of contract. Suit was brought in the alternative: count I alleged Indiana Industries and its subsidiary Rawleigh, Moses of Indiana breached certain warranties as to the validity of accounts receivable it sold to plaintiffs as part of a contract of sale dated December 30, 1970; and count II alleged that Lumbermens had issued an insurance policy to protect the plaintiffs against losses arising from the purchase of those accounts receivable. The coverage on the insurance policy became effective the same date as the sales contract, December 30, 1970. Defendants Indiana Industries and Rawleigh, Moses of Indiana refused to indemnify plaintiffs on the ground that plaintiffs' loss was caused by the purchase of fraudulent accounts during 1971, that is,

after the contract of sale of December 30, 1970. Defendant Lumbermens refused to indemnify plaintiffs on the ground that the loss occurred prior to the issuance of the insurance contract on December 30, 1970.

Defendant Lumbermens filed a counterclaim as subrogee of plaintiffs for indemnification against defendants Indiana Industries and Rawleigh, Moses of Indiana in the event judgment was entered against Lumbermens on the insurance policy issued to the plaintiffs.

All parties stipulated that there was no genuine issue of material fact and moved for summary judgment. Summary judgment was granted in favor of plaintiffs against defendant Lumbermens on count II, from which Lumbermens appeals; in favor of defendants Indiana Industries and Rawleigh, Moses of Indiana against plaintiffs on count I, from which plaintiffs appeal in the event the judgment against Lumbermens on count II is reversed; and on the counterclaim, in favor of counterdefendants Indiana Industries and Rawleigh, Moses of Indiana against counterplaintiff Lumbermens, from which Lumbermens appeals. Plaintiffs cross-appeal from the court's denial of prejudgment interest on the judgment against Lumbermens. The question of liability rests upon a determination of when the loss was sustained. To make such a determination, a basic understanding of the circumstances surrounding the occasion of the loss is needed.

Plaintiff Rawleigh, Moses of Delaware is a wholly owned subsidiary of plaintiff Central National Chicago Corporation. It is a commercial factor which is described by the parties as a company which provides financing to manufacturers by purchasing their accounts receivable which represent goods delivered but not yet paid for.

Rawleigh, Moses of Indiana is a subsidiary of the Bank of Indiana, which in turn is substantially owned by defendant Indiana Industries. Rawleigh, Moses of Indiana is also a factor, and as part of its business it at various times purchased accounts receivable from the E.C.T. Corporation of Fayetteville, North Carolina, a manufacturer chiefly of heavy duty canvas items such as tents, ammunition carriers, and other textile products. On December 30, 1970, plaintiffs entered into an agreement with Indiana Industries and Rawleigh, Moses of Indiana to purchase the business assets and assume all obligations and liabilities of Rawleigh, Moses of Indiana. Included in the purchase were 20 factored accounts of E.C.T. The purchase agreement included representations and warranties by defendants Indiana Industries and Rawleigh, Moses of Indiana that the factored accounts purchased were "valid, enforceable, genuine" and what they purported to be on their face. Defendants Indiana Industries and Rawleigh, Moses of Indiana also agreed to indemnify and hold harmless Rawleigh, Moses of Delaware and Central National against any loss suffered by Rawleigh, Moses of Delaware or

Central National arising from any breach of the representations and warranties contained in the agreement.

The E.C.T. Corporation accounts receivable purchased by plaintiffs purported to be valid claims against one of E.C.T.'s customers, the Defense Contract Administration Services Region of the Defense Supply Agency of the United States Government (DCASR). After its purchase of Rawleigh, Moses of Indiana, Rawleigh, Moses of Delaware continued to act as a factor and purchased DCASR accounts directly from E.C.T. Corporation. In late August, 1971, over eight months after the contract of sale, Rawleigh, Moses of Delaware began to notice irregularities in the collection of the DCASR accounts: there was an increase in the length of the collection period, and DCASR appeared to be taking a purchaser's discount for prompt payment on invoices apparently past due. Upon investigation, Rawleigh, Moses of Delaware discovered that E.C.T. had been engaged in the fraudulent practice of selling accounts receivable representing goods which either had not yet been shipped or had not been produced at the time the accounts were sold to the factor.

The scheme was perpetrated through the efforts of Morton M. Rose, president of E.C.T. Corporation. Rose would furnish the factor with lists of accounts allegedly due, supported by forged and fraudulent bills of lading and government inspection report forms. The factor, Rawleigh, Moses of Delaware, would then pay E.C.T. for these alleged accounts receivable. In the course of its business, E.C.T. would ship or manufacture and ship the goods represented by these accounts. When this occurred, Rose would see to it that the valid invoices issued to DCASR bore the same serial numbers as those sold to the factor, though the dates were obviously later. Upon receipt of the goods, DCASR would remit the amount due, based on the valid invoices. The remittance advices submitted by DCASR referred only to the serial numbers and amounts of the invoices; the dates of the accounts were not included. Payments thus received were credited to the like-numbered but invalid invoices held by Rawleigh, Moses of Delaware. This scheme began in April, 1970, some nine months before the purchase of Rawleigh, Moses of Indiana by plaintiffs, and continued until it was discovered in September, 1971.

Defendant Lumbermens insured plaintiff Central National under a policy known as a Bankers Blanket Bond against losses resulting from acceptance or purchase of forged or counterfeited business securities, documents, or other written instruments. When plaintiffs purchased the business and assets of Rawleigh, Moses of Indiana, including the E.C.T. accounts receivable, Central National asked that Rawleigh, Moses of Delaware be added as an insured under the bond. Coverage was extended by the addition of a loss sustained endorsement, effective December 30, 1970, which provided that:

" * * * no loss shall be recoverable under the bond unless it occurred subsequent to the date the above named insured [Rawleigh, Moses of Delaware] was purchased by Central National Bank in Chicago."

The critical issue in determining liability is deciding when the loss was sustained. On December 30, 1970, as part of the purchase of the business and assets of defendant Rawleigh, Moses of Indiana, plaintiffs purchased twenty fraudulent DCASR accounts receivable. These accounts had a net value of $363,078.34. Pursuant to Rose's scheme, E.C.T. shipped or manufactured and shipped all the goods represented by these accounts. Shipment was made at various times, but all the goods represented by the accounts transferred December 30, 1970, had been delivered by March 3, 1971. DCASR made payments to Rawleigh, Moses of Delaware for these goods throughout January, February and March of 1971. The final payment from DCASR for the goods represented by the fraudulent accounts of December 30, 1970, was received by Rawleigh, Moses on March 26, 1971.

During 1971, after plaintiffs Central National and Rawleigh, Moses of Delaware had purchased the business and assets of Rawleigh, Moses of Indiana, Rose continued the practice of selling fraudulent accounts to the factor and later shipping or manufacturing and shipping the goods, for which DCASR would remit payment to Rawleigh, Moses of Delaware. Between May 17 and September 9, 1971, when the sceme was discovered, plaintiff Rawleigh, Moses of Delaware bought 30 additional fraudulent DCASR accounts directly from the E.C.T. Corporation, having a net value of $386,307.46. E.C.T. was unable to either manufacture or ship the goods represented by these accounts to DCASR, which consequently never made payments to be applied to these accounts.

Defendant Lumbermens claims that there was in fact no interruption in E.C.T.'s methods of operation between December 30, 1970, and May 17, 1971. Rose continued his practice of furnishing the factor with predated DCASR invoices after Rawleigh, Moses of Indiana was sold. Lumbermens contends that the notion of a gap between March 26, 1971, and May 17, 1971, grew from Central's limited examination of the fraud, and that if the examination had begun earlier, fraudulent invoices prior to May 17, 1971, would have been discovered. However, Lumbermens concedes that Central had no reason to look before the May 17 invoice, "since the invoices previous to that date were 'paid'."

Defendant Lumbermens' theory of the case is that Rose's practice of selling fraudulent accounts to the factors constitued a continuing fraud, a sophisticated version of "kiting" or "lapping" schemes. Such stratagems are characterized by an initial theft hidden by subsequent misapplications of funds. Lumbermens cites cases involving various types of thefts of

funds, concealed by diverting subsequently received funds and by manipulating related bookkeeping records, and attempts to analogize them to the situation at hand. See *e.g., First National Bank of Temple v. Continental Casualty Co.* (5th Cir. 1938), 100 F.2d 308; *Continental Casualty Co. v. First National Bank of Temple* (5th Cir. 1941), 116 F.2d 885; *First National Bank of Temple v. Continental Casualty Co.* (5th Cir. 1943), 133 F.2d 197; *Aetna Casualty & Surety Co. v. First Trust & Savings Bank* (5th Cir. 1932), 62 F.2d 316; and *Eliot Savings Bank v. Aetna Casualty & Surety Co.* (1941), 310 Mass. 355, 38 N.E.2d 59; cases involving "kiting" schemes carried out by bank employees, or in the case of *Eliot Savings Bank*, a forger; and *John B. White, Inc. v. Providence Washington Insurance Co.* (E.D. Pa. 1971), 329 F. Supp. 300, involving an accounts receivable "lapping" scheme.

■■■ The process in those cases continued over an extended length of time, necessitating a determination of when the loss occurred in order to decide whether or not it was sustained before or after the effective date of the insurance policy. The similarity between defendant Lumbermens' cited cases and the instant case is apparent; the distinction is not as evident, yet it is the key to the resolution of this case. Rose did not conceal the theft by procuring more money through the issuance of additional fraudulent invoices. His scheme was concealed because he would ship or manufacture and ship the goods represented by the original fraudulent invoices, and DCASR would then pay off the amounts "due." The additional fraudulent invoices issued did not help to conceal the original theft, but instead created new losses. There can be no "rolling fraud" when the receipt of compensating funds occurs *before* the abstraction of additional funds. The scheme terminated on March 26, 1971, when the amount due represented by the outstanding fraudulent accounts transferred December 30 was satisfied by delivery of the merchandise as contemplated originally by the parties. A new fraud, one which resulted in injury and therefore an actionable loss, began on May 17, 1971, when new fraudulent accounts were sold to the factor, Rawleigh, Moses of Delaware.

■■ Lumbermens argues that the loss which occurred December 30, 1970, was never "paid." Lumbermens states that stolen funds cannot be repaid with additional funds stolen from the same victim, and that the money Rawleigh, Moses of Delaware received was only unwittingly attributed to and applied against the fraudulent invoices in question. However, by focusing on whether there has been payment in the sense of receipt of money due on a true and genuine invoice supported by a valid bill of lading, Lumbermens obfuscates the fact that here a third party, DCASR, outside the scheme itself, remitted money directly to the victim of the theft, which was applied against the "debt" created by the theft.

E.C.T., by shipping goods and genuine invoices to DCASR caused DCASR to pay Rawleigh, Moses of Delaware the exact amount which it had expended on the purchase of the similarly numbered fraudulent accounts from E.C.T. Corporation. Though DCASR did not know of the existence of the fraudulent invoices and therefore could not literally have "paid" them, the critical element is that Rawleigh, Moses of Delaware received the money which was apparently owed to it as evidenced by the accounts it had purchased from E.C.T. Whatever the bookkeeping procedures involved, the fact remains that there can be no recoverable loss where plaintiffs have been compensated for the injury suffered (*Meneghin v. Thunander* (1962), 36 Ill. App. 2d 452, 456-57, 184 N.E.2d 753), and here plaintiffs received the entire amount "due" on the fraudulent accounts transferred December 30, 1970. Plaintiffs are in the same position they would have been in had the December 30, 1970, accounts been true and valid, and any injury they may have suffered from such transfer of fraudulent accounts on December 30, 1970, was negated by receipt of payment from DCASR, after DCASR had received the merchandise it had agreed to purchase, despite defendant's attempt to characterize it as "unwittingly" applied against their invoices. The trial court correctly found that plaintiffs' loss was suffered in 1971, during the period of coverage by defendant Lumbermens' bond. Judgment for plaintiffs on count II against Lumbermens is therefore affirmed.

Plaintiffs complain that the trial court erred by denying them prejudgment interest on the judgment against defendant Lumbermens. Prejudgment interest is authorized by section 2 of the Interest Act (Ill. Rev. Stat. 1971, ch. 74, par. 2), which provides:

> "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing * * *."

■■ An insurance policy is considered an "instrument of writing" within the meaning of section 2, and it has long been held that interest may be recovered from the time money becomes due under a policy. (*Employers' Liability Assurance Corp. v. Kelly-Atkinson Construction Co.* (1915), 195 Ill. App. 620, 635; *Lewis Machine Co. v. Aztec Lines, Inc.* (7th Cir. 1949), 172 F.2d 746, 750.) In order for interest to be awarded, the sum due must be liquidated or subject to exact computation, and the existence of a good faith defense does not preclude recovery of interest. (*Hamilton Watch Co. v. George W. Borg Corp.* (1942), 317 Ill. App. 271, 284, 46 N.E.2d 112.) Here, although there may have been a legitimate dispute as to Lumbermens' liability, the amount due from Lumbermens' policy is ascertainable as plaintiffs' loss from the purchase of the fraudulent DCASR accounts. The court in *Martin v. Orvis Brothers & Co.*

(1974), 25 Ill. App. 3d 238, 251, 323 N.E.2d 73, summarized the principles which govern the awarding of interest under Illinois law:

> "For interst to attach, prior to judgment, absent an agreement, the amount must be fixed, or determinable, and due, in the sense that a · debtor-creditor relationship has come into being. (*Kansas Qualtiy Construction, Inc. v. Chiasson*, 112 Ill. App. 2d 277, 250 N.E.2d 785.) If the amount is determinable, interest can be awarded on money payable even when the claimed right and the amount due require legal ascertainment (*L. W. Foster Sportswear Co. v. Goldblatt Bros., Inc.* (7th Cir. 1966), 356 F.2d 906, construing Illinois law), *and the fact that the parties could reasonably differ as to their liability is not a consideration so far as the statute is concerned. (Kansas Quality Construction, Inc. v. Chiasson, supra.)*" (Emphasis added.)

■■ The order in favor of Lumbermens on the issue of prejudgment interest is therefore reversed.

■■ There is a question, however, as to the date from which interest should be assessed. Lumbermens' policy does not specify a particular date upon which payment of a claim under the policy shall be due and paid. Since " * * * the time from which interest is computed largely depends on the terms of the policy and the circumstances of the particular case," (*Di Leo v. United States Fidelity & Guaranty Co.* (1964), 50 Ill. App. 2d 183, 193, 200 N.E.2d 405), the question concerning the date from which Lumbermens should pay interest on the amount due under their Bankers Blanket Bond is remanded to the trial court for its determination.

■■ Lastly, Lumbermens argues that if it is held liable to Central National and Rawleigh, Moses of Delaware under its Bankers Blanket Bond, it should be subrogated to Central National's rights against Indiana Industries, and should recover for breach of the warranties regarding the fraudulent accounts transferred December 30, 1970, and the losses therefrom. However, while there can be no dispute as to the fraudulent nature of the accounts transferred on that date, nor any question that the warranties given by Indiana Industries as to the genuineness of those accounts were breached, as stated previously those fraudulent accounts were redeemed by payment by DCASR after shipment of the merchandise. Plaintiffs having suffered no injury therefrom may not recover for that fraud. (*Struve v. Tatge* (1918), 285 Ill. 103, 109; *Meenehan v. Rosenfield* (1925), 236 Ill. App. 4, 10.) The loss which plaintiffs incurred resulted from their purchase of fraudulent accounts receivable during 1971, and not from the accounts transferred December 30, 1970. Accordingly, since plaintiffs may not recover for that fraud, Lumbermens is not entitled to indemnification from Indiana Industries based on a

breach of the warranties contained in the contract for the purchase and sale of the business and assets of Rawleigh, Moses of Indiana of December 30, 1970.

The judgment in favor of plaintiffs Central National and Rawleigh, Moses of Delaware and against Lumbermens is affirmed.

The judgment in favor of third-party defendants Indiana Industries and Rawleigh, Moses of Indiana and against Lumbermens is affirmed.

The order denying pretrial interest is reversed and remanded with directions.

Plaintiffs' appeal against Indiana Industries and Rawleigh, Moses of Indiana was contingent upon a reversal of its favorable judgment against Lumbermens. That contingency has not arisen and the appeal is dismissed.

Affirmed in part; reversed and remanded in part; appeal dismissed in part.

DOWNING, P. J., and STAMOS, J., concur.