FARWELL CONSTRUCTION COMPANY, Plaintiff-Appellee and Cross-Appellant, *v.* HAROLD J. TICKTIN *et al.*, Defendants-Appellants and Cross-Appellees.

First District (5th Division)    No. 79-497

Opinion filed March 7, 1980.—Rehearing denied June 6, 1980.

Joseph J. Ticktin, of Chicago, for appellants.

Robert R. Tepper and Ross P. Benjamin, both of Chicago (Rosenthal and Schanfield, of counsel), for appellee.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

In this action for damages because of the anticipatory breach of an agreement to purchase real estate and the plans for an apartment complex, plaintiff was awarded $154,202.76. On appeal, defendants contend that (1) the trial court misconstrued the warranty provision in the agreement; (2) as a matter of law, plaintiff was not entitled to recover since it was not ready, willing and able to perform under the contract; (3) the trial judge incorrectly believed that an opinion of this court in a prior appeal required him to make a finding of anticipatory breach; (4) since the parties disagreed as to the interpretation of the contract, defendants did not commit an anticipatory breach as a matter of law; (5) plaintiff cannot recover because it was not yet entitled to performance at the time of the alleged repudiation; (6) recovery could not be had because the contract could not have been performed by either party in any event;

(7) the trial court erred in its determination of damages; and (8) the trial court erred in amending the judgment after defendants had filed a notice of appeal. In a cross-appeal, plaintiff asserted that the damages were less than it was entitled to and that it was improperly denied prejudgment interest.

It appears that sometime in 1971, defendants were seeking to construct an apartment complex known as "Brush Hill Apartments" in Naperville, Illinois. Defendants retained an architectural firm to develop plans for the complex and also sought mortgage insurance from the Federal Housing Administration (FHA). They submitted a set of plans dated June 11, 1971, to the FHA, as was required to obtain insurance and, on August 30, 1971, the FHA informed them via a "site planner's memo" that the June 11 plan was "acceptable for feasibility processing subject to" 11 changes which would have to be incorporated in the plans. Defendants' architects accordingly developed several revisions culminating in a site plan bearing the most recent revision date of May 30, 1972.

Sometime in the spring of 1972, Richard Fanslow, president of plaintiff, met with Ticktin regarding the possible purchase of defendants' property and plans. Concerning this meeting, Fanslow testified that Ticktin showed him the original set of plans and said that they were approved by the FHA with the exception of the items specified in the FHA site planner's memo; that he (Fanslow) voiced his opinion that the plans would not be acceptable to FHA; that Ticktin then affirmatively said the plans were approved except for items 3 and 7 on the memo; that he (Fanslow) reiterated his belief that FHA would..not consent to the deletion of the other items in the memo; and that Ticktin said FHA had given consent to delete the other objections.

Ticktin testified also that on August 19, 1972, he flew to Washington, D.C., to finalize an agreement for equity financing with American Housing Partners. No agreement was reached, however, and immediately afterward he returned to the airport to meet Fanslow and his attorney, who had also flown to Washington, D.C. The three went to a restaurant for lunch where Fanslow's attorney produced for signing the two documents giving rise to the instant litigation. One was an option contract granting plaintiff the option to purchase the property and all plans for the apartment complex prepared as of that date for $340,000, and the other was a letter containing a warranty agreement. The letter, in pertinent part, stated that defendants undertook to

"(1) warrant and represent to you that the Plans entitled 'Brush Hill Apartments, December ___, 1971' drawn by Weinper & Balaban, Inc. have been approved by FHA and meet FHA's MPS requirements; and

(2) agree with you that in the event FHA, prior to initial endorsement by FHA of the insured mortgage note, requires any changes, refinements or modifications in said Plans which shall increase construction costs by more than Twenty Thousand ($20,000.00) Dollars, the undersigned [defendant] shall pay to you at the initial endorsement the full amount of any such increased construction costs in excess of Twenty Thousand ($20,000.00) Dollars."

Fanslow testified that at this luncheon meeting Ticktin said "all the items were approved and the drawings"; that Ticktin was worried about items 3 and 7 on the August 30 FHA memo; that Ticktin wrote on the letter a clause excluding those items from the warranty and stated, "Let's make those exclusions, and I feel very comfortable that I will get everything else approved"; and that he (Fanslow) responded "fine." He also testified with respect to the handwritten revision that "[Ticktin said the] drawings were approved on that date except for the exception letter. And he said everything else could be waived except for items 3 and 7— that is dated, the August 31 letter date. That is the reason they are excluded from that document." The warranty letter was introduced into evidence, and it bore the inscription "except items 3 & 7 in FHA's letter dated August 31, 1971," which was written in after paragraph (1) and initialed by both parties. In addition, Ticktin also testified that at this meeting he expressed concern that "Exhibit A," which was attached to the grant of option and which described the property covered by the option, was not sufficiently clear. He asked Fanslow's attorney if the property could be more fully described, and the attorney then added (in his handwriting) the phrase, "and not reduce the number of buildings in said Resubdivision as per site plan dated 1/25/72 revised to 5/30/72 by Weinper and Balaban, Inc.," which apparently clarified matters in the minds of the parties.

On November 10, 1972, Ticktin sent plaintiff a letter wherein it exercised the option and also stated, "the Plans referred to in [the warranty] letter do not meet F.H.A.'s M.P.S. requirements, and the construction cost of meeting F.H.A.'s requirements will be in excess of Twenty-Thousand ($20,000) Dollars. We shall advise you of the exact amount of such additional costs when a closing date is established and shall expect payment thereof at the initial endorsement of the F.H.A. mortgage." Plaintiff then sent a letter dated January 29, 1973, which proposed a closing date of February 8, 1973, and asked that the parties meet on February 5 at the offices of Pioneer National Title Insurance Company to establish an escrow. In addition, the letter listed 12 items which plaintiff claimed were required to be added to the original plans by the FHA. It was stated that items 1 through 8 were required by the FHA

outright, and items 9 through 12 were necessary to bring the project into compliance with the Naperville Building Code. The letter also set forth the additional costs totaling $147,069.76.

Ticktin responded in a letter dated February 1, 1973, agreeing to the dates for escrow and closing but denying that plaintiff was entitled to any payments, stating:

"It is our opinion that you are not entitled to [the credits] and in passing we wish to point out to you some of the reasons for your nonentitlement. Credits 1-8 were items of construction as shown in plans drawn by Weinper & Balaban dated December ____, 1971 and revised through May 31, 1972 which were in the F.H.A.'s and your possession on or before June 30, 1972 and were all part of plans referred to as 'Brush Hill Apartment, December ____, 1971 drawn by Weinper & Balaban,' in our letter agreement of August 17, 1972. Credits 9-12 were required by the City of Naperville and have nothing to do with the MPS of the F.H.A. to which the letter agreement of August 17, 1972, is directed."

At this point, it should be noted that it is apparently undisputed that items 1 through 8 did not appear in the original plans but were incorporated in the May 31, 1972 revisions.

The record indicates that during this period of time, Ticktin and Fanslow had 5 to 10 conversations. Fanslow specifically testified to one telephone conversation concerning the payments under the warranty where Ticktin "told me that he was never going to pay it and I should go 'F' myself." Ticktin admitted making this statement. Fanslow also testified to a conversation held with Ticktin at Pioneer Title where he "refused to acknowledge any of" the items and "[j]ust would not agree" to them.

At any rate, it appears that Ticktin was present at Pioneer Title on February 5, 1973, to set up the escrow, but Fanslow did not attend. The next day, Ticktin wrote another letter to Fanslow stating that he would nonetheless attend the February 8 closing. On that date, Ticktin appeared, but again Fanslow did not.

Plaintiff then filed suit on February 15, 1973, for specific performance of the contract. Upon learning that defendants no longer held title to the property, plaintiff filed an amended complaint for damages alleging an anticipatory breach of the contract and defendants counterclaimed, alleging that plaintiff had exercised the option and breached the agreement. The trial court found, however, that the option was never in fact exercised and, accordingly, entered judgment against plaintiff in its action and against defendants on the counterclaim. Plaintiff appealed, and this court held that plaintiff had in fact exercised the option and remanded for finding on the questions of breach of contract and damages. (*Farwell*

*Construction Co. v. Ticktin* (1978), 59 Ill. App. 3d 954, 376 N.E.2d 621.) On remand, the trial court, while not receiving further testimony, considered the arguments of counsel and, on November 13, 1978, entered an order finding defendants had anticipatorily breached the contract and that plaintiff was entitled to the claimed credits for items 1 through 8 but not 9 through 12. The court entered judgment for $124,133 and costs, from which on December 5 defendants filed a notice of appeal. Plaintiff then filed a post-trial motion on December 8 to modify the judgment to correct errors made in the calculation of damages. The trial court, on December 14, amended its order to increase damages to $154,202.76 and costs but denied other aspects of the post-trial motion and, from those denials, plaintiff cross-appealed on December 15. Defendants also filed a second notice of appeal on December 27 from the amended judgment.

OPINION

Initially, we note that the crucial question here concerns which set of plans was covered by the warranty letter. The letter itself refers to "the Plans entitled 'Brush Hill Apartment, December ___, 1971' drawn by Weinper & Balaban, Inc.," but it appears that the only plans bearing such a date are for the recreation area of the complex only, and both parties apparently agree that the warranty was not intended to cover this set of plans. Plaintiff's position is that the warranty referred to the original set of plans covering the entire complex and drawn earlier in 1971, and that defendants' refusal to honor the agreement as warranting such original plans was an anticipatory breach. Defendants argue, on the other hand, that the warranty covered the May 31, 1972, revised site plan and that they were therefore justified in refusing to perform in accordance with plaintiff's interpretation.

I.

Thus, defendants' first contention is that the trial court erred in construing the warranty letter as referring to the original site plan. In this regard, we note that in construing a contract, the paramount objective is to ascertain the intent of the parties (*Standard Steel & Wire Corp. v. Chicago Capital Corp.* (1975), 26 Ill. App. 3d 915, 326 N.E.2d 33; *Industrial Commodity Corp. v. E. J. Brach & Sons* (1968), 92 Ill. App. 2d 163, 235 N.E.2d 857), and this is ordinarily determined from the language embodied in the final agreement (*Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 154 N.E.2d 683; *LaSalle National Insurance Co. v. Executive Auto Leasing Co.* (1970), 121 Ill. App. 2d 430, 257 N.E.2d 508). However, if the contract language is ambiguous, extrinsic evidence as to prior and contemporaneous transactions and facts may be considered to ascertain the parties' intent. (*Kenny Construction Co. v. Metropolitan*

*Sanitary District of Greater Chicago* (1971), 52 Ill. 2d 187, 288 N.E.2d 1, *appeal after remand* (1974), 56 Ill. 2d 516, 309 N.E.2d 221; *Arthur Rubloff & Co. v. Comco Corp.* (1978), 63 Ill. App. 3d 362, 380 N.E.2d 15; *Standard Steel & Wire Corp. v. Chicago Capital Corp.*) Further, the construction or interpretation of a clause in a contract is a question of law (*Illinois Valley Asphalt, Inc. v. La Salle National Bank* (1977), 54 Ill. App. 3d 317, 369 N.E.2d 525) to be determined by a reviewing court unrestrained by the trial court's judgment (*Arthur Rubloff & Co. v. Comco Corp.*).

In the case at bar, we think it is clear (as the trial court found) that the parties intended that the warranty letter cover the original site plan. Fanslow and Ticktin discussed the FHA's objections to these plans, which were set forth in the FHA memo when they first met in the spring of 1972. With respect to this meeting, Fanslow testified that Ticktin showed him the original site plan; that he (Fanslow) told Ticktin that in his opinion the plans would not be acceptable to FHA; and that Ticktin stated that the FHA had given consent to delete the objections, with the exception of items 3 and 7 in the FHA memo. Thus, it appears that even at this point Fanslow was concerned about the acceptability of the original plans and, at the actual signing of the agreements on August 17 when his attorney produced the warranty letter he had drafted, Fanslow testified that Ticktin wrote an inscription on the warranty letter excluding items 3 and 7 on the FHA list, explaining, "Let's make those exclusions, and I feel very comfortable that I will get everything else approved." In the light thereof, we think it clear that the parties were focusing upon the FHA memo which listed objections to the original set of plans and, thus, the reasonable conclusion is that in executing the warranty letter which referred to that memo, the parties had the original site plan in mind.

Defendants point to numerous facts which they claim support their position that the letter was intended to cover the revised set of plans rather than the original. First, they point out that the May 30, 1972, revisions were spread upon the table at the time the warranty letter and grant of option were signed. This fact is not particularly persuasive, however, in view of the fact that numerous documents, including the original set of plans and FHA's objections thereto, were also there. Second, defendants refer us to the last page of the option contract on which Fanslow's attorney inscribed a reference to the revised site plan. We note, however, that with respect to the events giving rise to this inscription, Ticktin testified that he was "worried that [the option] only describe[d] a number of square feet that they were going to get and I did not want to be in the situation being left with my parcel of land interspersed in various parcels in their parcel of land, and possibly landlocked"; that he "asked if it would be possible to more fully describe

the property that they are talking about"; and that Fanslow's attorney consented and wrote in the phrase referring to the revised site plan. Thus, we think it is clear that the handwritten amendment was made solely for the purpose of identifying certain property involved in the grant of option and was not directly related to the improvements in the warranty letter, which was a separate document. Third, defendants argue that the letter warrants that the plans in question "have been approved by FHA"; that both parties knew the original plans had not been so approved; and that therefore the parties could not have intended the warranty to cover the original set of plans. We are not persuaded by this argument, since Fanslow specifically testified that Ticktin told him at their meeting in the spring of 1972 that FHA agreed to delete most of their objections in the site planner's memo and had approved the original site plan. Fourth, defendants assert their position is supported by the fact that the option contract entitled plaintiff to receive "all plans and specifications prepared as of this day or hereafter" and they urge that the warranty must therefore refer to the most recent existing plans. We disagree, since under that line of reasoning any future plans prepared "hereafter" would also be covered by the warranty, and this unquestionably was not intended. Finally, defendants say that because the original plans were unrevised and incomplete, it would be "unthinkable" for them to guarantee such plans. We are not in a position to ascertain what was "unthinkable" but we can make a determination whether the record supports the court's implicit finding that the warranty letter was intended to cover the original set of plans and, as discussed above, we believe there is convincing evidence to support such finding.

■■ Defendants also assert that we should construe the warranty letter against plaintiff to cover the revised plans, because plaintiff's attorney drafted the document. We realize that under the doctrine of *contra proferentem*, ambiguities are to be construed against the party who drafted the contract (*Ellerman v. Clark Products, Inc.* (1978), 67 Ill. App. 3d 848, 384 N.E.2d 940; *Pescaglia v. Gianessi* (1973), 9 Ill. App. 3d 582, 295 N.E.2d 148), but we think this rule is "[a]t best * * * a secondary rule of interpretation, a 'last resort' which may be invoked after all of the ordinary interpretative guides have been exhausted" (*Hurd v. Illinois Bell Telephone Co.* (N.D. Ill. 1955), 136 F. Supp. 125, 134, *aff'd* (7th Cir. 1956), 234 F.2d 942, *cert. denied sub nom. Seybold v. Western Electric Co.* (1956), 352 U.S. 918, 1 L. Ed. 2d 124, 77 S. Ct. 216; see also *Bowler v. Metropolitan Sanitary District* (1969), 117 Ill. App. 2d 237, 254 N.E.2d 144; *Vogel v. Melish* (1964), 46 Ill. App. 2d 465, 196 N.E.2d 402, *aff'd* (1964), 31 Ill. 2d 620, 203 N.E.2d 411; 17 Am. Jr. 2d *Contracts* §276 (1964); 12 Ill. L. & Prac. *Contracts* §221 (1955)). In the instant case, we believe our efforts to ascertain the intent of the parties by means of extrinsic

evidence has yielded a convincing result and, accordingly, have no need to utilize this "last resort" rule of construction.

## II.

Defendants next point out that plaintiff contended it was entitled to credits 9 through 12, which were required by the city of Naperville; that the trial court found that plaintiff was not entitled to such credits; that plaintiff was thus not "ready, willing and able" to perform the contract in accordance with the court's interpretation of it; and that plaintiff therefore cannot recover for anticipatory breach. Defendants cite no law in support of this theory; but, in any event, we view this argument as ignoring the seminal question in this litigation—namely, the identity of the plans covered by the warranty. Plaintiff's position was that the agreement as properly interpreted warranted the original set of plans, while defendant contended that the warranty covered the May 30, 1972, revisions. The trial court properly determined that defendants' interpretation of the contract was correct. Thus, plaintiff was in fact "ready, willing and able" to perform the contract according to the proper interpretation. We recognize the trial court held that plaintiff was not entitled to credits 9 through 12, which it claimed; however, in light of the above, we feel this goes only to the question of damages and does not preclude plaintiff from recovery in the case at bar.

## III.

Defendants also point to certain portions of the report of proceedings wherein the trial judge indicated that he felt plaintiff's nonentitlement to credits 9 through 12 might have affected its right to recovery. They assert that the trial judge erroneously believed that he was precluded by our opinion rendered in the prior appeal from considering this factor and, in effect, mandated a finding of anticipatory breach. We see no merit in this argument. We have held above in this opinion that plaintiff's non-entitlement to these credits did not affect its right to bring a suit for anticipatory breach. Thus, it is of no significance the trial judge felt he could not consider this factor. Moreover, we note that the trial judge made several statements indicating that he was persuaded by the evidence that plaintiff was entitled to recover for anticipatory breach:

> "It's my view of the record, gentlemen, that the defendants did not evidence an intention to live up to their obligation in the terms of the contract. I think that's very clear in the record.
>
> So it's my view of the contract that the only thing really open to the Court is in the question of assessment of damages, which is considerable * * *.

* * *

It's my opinion that the record is clear that the defendants manifested an intention not to perform the contract which the Appellate Court found existed between the parties. And it's my feeling that the only issue that's open—which is the issue of damages, which the Court recalls was considerable * * *."

In addition, we note the following exchange which took place between defendants' attorney and the trial judge:

"[DEFENDANTS' ATTORNEY]: * * * frankly, I'm very much surprised that the ruling of the Court in which you say you feel that you are bound by the opinion, and I would like an opportunity to look up some law on that question.

THE COURT: No, I'm not. Now, counsel, you are leading me into a pitfall. I have looked up the law. I have read the Appellate Court decision. I have analyzed the case. I made my own judgment. There is no question that my finding, in my mind, is correct."

We therefore reject defendants' contention that the trial court ruling was erroneously based on a mistaken belief that it was somehow bound by our prior opinion.

## IV.

■■ Defendants next direct us to the following statement in our opinion rendered on the prior appeal:

"On the other hand, a refusal to perform does not amount to an anticipatory breach * * * where the parties disagree in the interpretation of the contract (4 Corbin on Contracts §973, at 911 (1951)) * * *." (*Farwell Construction Co. v. Ticktin* (1978), 59 Ill. App. 3d 954, 962, 376 N.E.2d 621, 627.)

Defendants argue that since this rule of law was announced in the prior appeal of this case, it is binding in the instant appeal; that in the case at bar the evidence shows that the parties disagreed as to the interpretation of the contract; and that, in accordance with the above rule of law, defendants' refusal to perform is not an anticipatory breach. We disagree. Initially, we point out that defendant has ignored the relevant portion of the authority which we cited in our opinion. In 4 Corbin, Contracts §973, at 911-12 (1951), it is stated:

"Where the two contracting parties differ as to the interpretation of the contract or as to its legal effects, an offer to perform in accordance with his own interpretation made by one of the parties is not in itself an anticipatory breach. In order to constitute such a breach, the offer must be accompanied by a clear manifestation of intention not to perform in accordance with any other interpretation. So, also, the making of a demand upon the other party to

a contract that he shall perform in accordance with an interpretation that is not justified by the law is not in itself a repudiation; such a demand, however, does not require much by way of accompanying expressions in order to justify the other party in understanding that no performance other than that demanded will be accepted." ·

See also 17 Am. Jur. 2d *Contracts* §450 (1964). Thus, it is clear that disagreement as to the proper interpretation of the contract may in fact constitute an anticipatory breach if the erring party indicates that no performance other than that demanded will be accepted. In the instant case, we note Fanslow's uncontradicted testimony that Ticktin continually "refused to acknowledge *any* of" the claimed credits (emphasis added) as well as Ticktin's admonition that Fanslow "should go 'F' " himself. Clearly, Ticktin's statements amount to an indication that he would accept no performance other than one conforming to his erroneous interpretation of the contract as warranting the revised site plan.

■■ Furthermore, while we agree with defendants that the rules of law announced by an appellate court are conclusive upon a second appeal of the same case (*Hoffman v. Stephens* (1915), 269 Ill. 376, 109 N.E. 994; *In re Estate of Maher* (1903), 204 Ill. 25, 68 N.E. 159), this rule does not apply where the pronouncement does not concern the point upon which the original appeal was decided (*Rigdon v. Conley* (1892), 43 Ill. App. 593, *aff'd* (1892), 141 Ill. 565, 30 N.E. 1060). In the prior appeal of the instant case, we made the statement in question in the course of discussing the general principles applicable to anticipatory breach. However, we did not then render a decision on that issue and, accordingly, are not bound in this appeal by any statements formerly made in that regard.

## V.

Defendants next argue that the warranty did not cover all changes required by FHA, but only those necessary to bring the plans into compliance with FHA's Minimum Property Standards (MPS) requirements; that while plaintiff proved that the FHA required changes 1 through 8, it introduced no evidence showing that these constituted MPS violations; and that plaintiff was therefore not entitled to credits for those amounts. We disagree. In the relevant portions of the letter, defendants warranted:

"(1) * * * that the Plans * * * have been approved and meet FHA's MPS requirements; and

(2) agree[d] * * * that in the event FHA * * * requires any changes, refinements or modifications in said Plans which shall increase construction costs by more than Twenty Thousand ($20,000.00) Dollars, the undersigned shall pay to you at the initial

endorsement the full amount of any such increased construction costs in excess of Twenty Thousand ($20,000.00) Dollars."

Paragraph (2), which governed the issue of credits, clearly allowed such payments in the event FHA required "*any* changes, refinements or modifications" (emphasis added) in excess of $20,000. There is no indication that the payments were authorized only if the changes were necessary to bring the plans into compliance with MPS requirements. Defendants argue that we must limit paragraph (2) in this fashion, otherwise paragraph (1) will be rendered meaningless, thus violating the doctrine that a contract should be interpreted in such a manner as to give effect to all of its provisions. (*Illinois Valley Asphalt, Inc. v. La Salle National Bank* (1977), 54 Ill. App. 3d 317, 369 N.E.2d 525; *Gross v. University of Chicago* (1973), 14 Ill. App. 3d 326, 302 N.E.2d 444.) We disagree, as we believe that our construction clearly gives effect to both paragraphs. In addition to warranting that the MPS requirements have been satisfied, paragraph (1) guarantees that the plans "have been approved," thus implying that defendants guaranteed against *any* changes. Paragraph (2) sets forth the scheme by which plaintiff is to be paid for any violations of the warranty set forth in paragraph (1). Thus, both paragraphs are given full effect. Defendants also assert that we should limit the warranty to the MPS requirements because the letter was drafted by plaintiff's attorney and therefore should be construed against the drafter where there is an ambiguity. However, we find no ambiguity and, as stated above, we thus have no need to implement this "last resort" doctrine. *Hurd v. Illinois Bell Telephone Co.*

■ Defendants also point out that under the agreement payments to plaintiff for violation of the warranty were to be made "at the initial endorsement," and they assert that plaintiff insisted on receiving these payments prior to initial endorsement. Thus, they suggest that they were justified in dishonoring plaintiff's claim for credits and that they did not commit an anticipatory breach. We disagree. Initially, we note that defendants in their brief have included no references to the record to support their assertion that plaintiff insisted on early payment, as required by Supreme Court Rule 341(e)(7) (Ill. Rev. Stat. 1977, ch. 110A, par. 341(e)(7)). We emphasize that it is not our duty to search the record for material upon which to base a reversal (*Clark v. Rockford Yellow Cab & Transfer Co.* (1957), 14 Ill. App. 2d 262, 144 N.E.2d 467 (abstract)), and, unless reference is made to the abstract or record concerning evidence supporting a reversal, such alleged errors will not be considered. *Alpe v. Superior Coal Co.* (1917), 208 Ill. App. 67.

In any event, it appears that defendants have misconstrued the concept of anticipatory breach. An anticipatory breach occurs when a party to an executory contract manifests a definite and unequivocal intent

prior to the time fixed in the contract that it will not render its performance under the contract when that time arrives. (*Keep Productions, Inc. v. Arlington Park Towers Hotel Corp.* (1977), 49 Ill. App. 3d 258, 364 N.E.2d 939; *Hull v. Croft* (1907), 132 Ill. App. 509; *Engesette v. McGilvray* (1896), 63 Ill. App. 461; 17 Am. Jur. 2d *Contracts* §450 (1964); 4 Corbin, Contracts §973 (1951); 11 Williston, Contracts §1323 (3d ed. 1968).) In such a case, the other party may treat the contract as ended. (*Keep Productions, Inc. v. Arlington Park Towers Hotel Corp.*; 4 Corbin, Contracts §959 (1951).) Further, we note that whether a party has committed breach is a question of fact (*Executive Centers of America, Inc. v. Bannon* (1978), 62 Ill. App. 3d 738, 379 N.E.2d 364; 12 Ill. L. & Prac. *Contracts* §434 (1955)), and the judgment of the trial court thereon should not be disturbed unless it is clearly against the manifest weight of the evidence. *Executive Centers of America, Inc. v. Bannon*; *Elgin Lumber & Supply Co. v. Malenius* (1967), 90 Ill. App. 2d 90, 232 N.E.2d 319.

In the case at bar, defendants in their letter of February 1, 1973, to plaintiff indicated that they interpreted the contract as warranting the revised set of plans; that Fanslow testified Ticktin "refused to acknowledge any of" the credits and "[j]ust would not agree" to them; and that Ticktin told Fanslow that he "should go 'F'" himself. In light thereof, we cannot say the trial court's conclusion that defendants showed a manifestation of a definite and unequivocal intent not to render performance when due under the contract is against the manifest weight of the evidence. We therefore reject defendants' contention that their breach was somehow cured because plaintiff was not to receive the payments until the initial endorsement.

## VI.

Defendants next assert that they cannot be found in anticipatory breach since initial endorsement was a condition of the contract and the evidence shows that such endorsement would not have taken place in any event. They direct us to the following quotation from Restatement of Contracts §306, comment a, at 452 (1932):

> "[I]f the condition could not or would not have been performed had there been no repudiation of the promise, the promisor is not precluded from asserting the requirement of the condition. In such case both parties are free."

Defendants then point to an FHA inter-office memorandum in evidence, dated January 21, 1973, which stated that approval of the Brush Hill Apartments Project was being withheld because other FHA mortgages by two persons involved were in default. It is argued that this memorandum showed that the contract could not be performed since there would have

been no initial endorsement and, therefore, that defendants cannot be held liable for anticipatory breach. We disagree, as the memorandum explicitly states, "This action does not preclude processing of the project," and thus it is not clear that the contract could not have been performed.

Defendants also assert that it was plaintiff's burden to come forward with evidence that the project would have proceeded in any event, citing 4 Corbin, Contracts §978, at 925-26 (1951):

"If such ability and willingness [of the plaintiff to perform the contract] are put in issue by the defendant, the burden of establishing them should usually be put on the plaintiff."

In the case at bar, however, the memorandum clearly stated that processing was not precluded, and thus we do not believe the memorandum placed in issue the ability of plaintiff to perform. We therefore hold that defendants were not free from liability on the ground that the contract could not have been performed.

## VII.

■■ Defendants next raise several objections to the trial court's determination of damages. It is well established that the measure of damages for breach of a contract for the sale of land is the excess of the market value of the property at the time of breach over the contract price. (*Dady v. Condit* (1904), 209 Ill. 488, 70 N.E. 1088; *Spangler v. Holthusen* (1978), 61 Ill. App. 3d 74, 378 N.E.2d 304; 35 Ill. L. & Prac. *Vendor & Purchaser* §176 (1958).) Although plaintiff has the burden of proving damages to a reasonable degree of certainty (*Pathman Construction Co. v. Hi-Way Electric Co.* (1978), 65 Ill. App. 3d 480, 382 N.E.2d 453; *Williams v. Board of Education* (1977), 52 Ill. App. 3d 328, 367 N.E.2d 549), all that is required by way of proof is that the evidence shall with a fair degree of probability tend to establish a basis for the assessment of damages (*F. B. Miller Agency, Inc. v. Home Insurance Co.* (1934), 276 Ill. App. 418; *Barnett v. Caldwell Furniture Co.* (1917), 277 Ill. 286, 115 N.E. 389). Further, a trial court's assessment of damages will be set aside only if it is manifestly erroneous. *Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 321 N.E.2d 1, *cert. denied* (1975), 420 U.S. 975, 43 L. Ed. 2d 655, 95 S. Ct. 1398; *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 281 N.E.2d 323; *64 E. Walton, Inc. v. Chicago Title & Trust Co.* (1979), 69 Ill. App. 3d 635, 387 N.E.2d 751.

Here, defendants first attack the trial court's finding as to the market value of the property. In this regard, Ticktin and his vendee, Paul Hoffman, testified that the land had a market value of $216,000. Fanslow and John Whitney, his investment partner, testified that the property had a value of $288,000. There was also evidence that the FHA had appraised the land at $274,000. The trial court in calculating damages used a market

value figure of $288,000. Defendants essentially argue that Ticktin and Hoffman were more credible than the others and that the trial court should have employed their figure in calculating damages. It is pointed out that Ticktin's office is located less than two miles from the site; that Ticktin had been in contact with realtors and developers; and that Hoffman was a disinterested witness. This does not persuade us, however, to modify the judgment of the trial court. Market value may be proven by the opinions of witnesses who possess the requisite knowledge (*Leavitt v. Lusch* (1915), 192 Ill. App. 504; also see *Cannell v. State Farm Fire & Casualty Co.* (1975), 25 Ill. App. 3d 907, 323 N.E.2d 418), and the issue of credibility of witnesses is one for the trial court which saw and heard them—not the reviewing court (*Stilwell v. Continental Illinois National Bank & Trust Co.* (1964), 31 Ill. 2d 546, 202 N.E.2d 477; *Young v. Marcin* (1978), 66 Ill. App. 3d 576, 384 N.E.2d 404; *Ross v. Steiner* (1978), 66 Ill. App. 3d 567, 384 N.E.2d 398). Accordingly, we reject defendants' contention that the trial court should have accepted the testimony of Ticktin and Hoffman as to the market value, rather than that of Fanslow and Whitney.

Defendants then argue that there was insufficient evidence for the trial court to determine the contract price. Pursuant to the grant of option and warranty letter, the contract price was $340,000 less construction costs in excess of $20,000 necessitated by changes required by FHA. At trial, plaintiff established the amounts of these costs by the testimony of Robert Curtin, president of a company which performed physical alterations of property, who gave his opinion based on his experience as to the cost of each modification required by FHA. Defendants offered no evidence to contradict these figures, but they now argue essentially that Curtin's testimony was hearsay and insufficient to support a finding, and that their motion to strike his testimony on that ground was "taken under advisement but never ruled upon." In this regard, we note that "when the court reserves its ruling on a motion or on objection, the movant or objecting party must seek a decision or ruling in order to preserve the motion or objection for review." (*In re Annexation to the Village of Downers Grove* (1974), 22 Ill. App. 3d 122, 127-28, 316 N.E.2d 804, 808.) Thus, defendants cannot now attack Curtin's testimony on the basis of hearsay.

Defendants also urge, without citation of any authority, that the proof of costs was inadequate in that plaintiff should have presented evidence of binding contracts to make the modifications or "at the very least, * * * proof of bona fide bids for the extra work." We disagree. As noted above, "[a]ll that the law requires * * * is that the evidence shall with a fair degree of probability tend to establish a basis for the assessment of damages." (*F. B. Miller Agency, Inc. v. Home Insurance*

*Co.* (1934), 276 Ill. App. 418, 431.) In the instant case, we believe Curtin's informed opinion as to the costs tended "to establish a basis for the assessment of damages," particularly in light of defendants' failure to introduce any countervailing evidence. We therefore conclude that the increased construction costs were adequately proven and that the damages awarded, as corrected to $154,202.72, was established by the evidence.

## VIII.

Defendants' final contention is that after their notice of appeal was filed, the trial court lacked jurisdiction to consider plaintiff's subsequent post-trial motion, which requested (1) the correction of an arithmetic error made in the original determination of damages; (2) the subtraction from the contract price of the cost for items 9 through 12, which were required by the city of Naperville; and (3) an award of prejudgment interest from the date of the breach. Although defendants question only the correction of the damage award, the jurisdictional issue reaches all three of the matters raised in the post-trial motion, and we shall ultimately review each one.

Before doing so, however, we will consider the question of whether a post-trial motion may be filed after a notice of appeal by another party. In this regard, we initially note that a post-trial motion may be filed within 30 days after judgment under section 68.1 (jury cases) or 68.3 (nonjury cases) of the Civil Practice Act. (Ill. Rev. Stat. 1977, ch. 110, pars. 68.1, 68.3.) Here, defendants do not contest plaintiff's right to file a motion, and we also are of the belief that the filing of a notice of appeal under Supreme Court Rule 303(a) (Ill. Rev. Stat. 1977, ch. 110A, par. 303(a)) should not foreclose the right of another party to file a timely post-trial motion. To hold otherwise could result in manifest unfairness. For example, in jury cases, it has been generally held that only those errors specified in the post-trial motion may be raised on appeal. (*Domena v. Prince* (1977), 52 Ill. App. 3d 462, 367 N.E.2d 717; *Taskay v. Foschi Bros. Inc.* (1976), 44 Ill. App. 3d 707, 358 N.E.2d 730.) Thus, if a party were precluded in a jury case from filing a post-trial motion because his opponent filed a notice of appeal, that party might be unable to pursue the right to a cross-appeal or a separate appeal.

Turning then to the question of the trial court's jurisdiction to act upon plaintiff's post-trial motion, we note the established rule that upon the filing of a notice of appeal the jurisdiction of the reviewing court attaches instanter (*Mitchell v. Mitchell* (1977), 54 Ill. App. 3d 18, 369 N.E.2d 276; *Moore v. Moore* (1977), 53 Ill. App. 3d 228, 368 N.E.2d 545), and with certain exceptions not relevant here, the trial court is then

deprived of jurisdiction (*City of Chicago v. Myers* (1967), 37 Ill. 2d 470, 227 N.E.2d 760; *Brehm v. Piotrowski* (1951), 409 Ill. 87, 98 N.E.2d 725). Assuming this rule to be applicable in the instant case, the trial court lacked jurisdiction to hear and grant plaintiff's post-trial motion at that time, and it thus could properly have decided the motion only after remandment by this court. However, as this is the second appeal of a case initially filed in 1973, rather than to remand, we deem it appropriate to invoke our original jurisdiction to complete the determination of any cause on review. (Ill. Const. 1970, art. VI, §6; Ill. Rev. Stat. 1977, ch. 37, par. 32.1.) With respect to such original jurisdiction, it was said in *Franks v. North Shore Farms, Inc.* (1969), 115 Ill. App. 2d 57, 74, 253 N.E.2d 45, 53-54:

> "In view of the trial court's superior position of observation, the better practice is for a trial court to pass upon all motions presented in the post-trial motion and to preserve the reviewing court's role as one of review of such decisions. Rigid adherence to this belief would compel us to remand this case to the trial court to pass upon the motion * * * . The decision of the trial court then would be the potential subject of another appeal. The history of our present section 68.1 of the Civil Practice Act discloses a studied attempt by the legislature and by the Supreme Court to prevent the necessity of multiple appeals on motions pertaining to post-trial relief. In accord with this endeavor, we deem it advisable for an Appellate Court, pursuant to the authority granted by the constitutional provision and statute above cited, to exercise original jurisdiction and pass upon the * * * motion * * * ."

Accordingly, we will pass on the matters raised by plaintiff in its post-trial motion. First, in its appeal plaintiff asserted that the trial court erred in its original calculation of damages. We note that prior to entry of the first judgment order, the trial judge stated his findings as to the particular figures involved in computing the damage award, such as the market value of the land and credits allowed. Plaintiff contended in its motion that these figures were inaccurately compiled in the first order and that the award, properly calculated, should have been $154,202.72. Since we held above that an award in that amount was established in the evidence, we accordingly grant this part of the motion presented to the trial court.

Parenthetically, we note that to deprive until remandment the trial court's jurisdiction to hear a timely filed post-trial motion after the filing of a notice of appeal by another party would result in multiple appeals and, to avoid this problem, the standing rules committee should consider a revision to permit rulings on such motions timely filed—whether before or after a notice of appeal by another party.

CROSS-APPEAL

The second and third matters raised in the post-trial motion were denied, and plaintiff's cross-appeal is from their denial.

In the first of these, it contends that the trial court erred in disallowing construction costs for items 9 through 12 which were required to bring the plans into compliance with the Naperville Building Code. Its argument in support of this contention is somewhat complex. It suggests that the trial court disallowed these costs because it felt that the Naperville items were required as a result of deficiencies in certain plans dated November 14, 1972, and thus were not within the warranty which was signed prior to that date and which covered the original site plan. Plaintiff bases this suggestion on the following portion of the trial judge's opinion rendered in the original proceeding prior to the first appeal:

"It seems clear to the court that the corrections required by the City of Naperville as a result of the November 14, 1972 revisions totalling $45,577.00 were never contemplated by the parties when the seller executed the * * * warranty * * *."

Plaintiff then concludes that the trial judge must have based this belief on a misinterpretation of a letter to Fanslow from Mars Construction, Inc., which Fanslow had contacted to determine the cost of the Naperville modifications. The letter, which was received in evidence, reads in pertinent part:

"Dear Rich:

As per your request, I am including a breakdown of the additional costs incurred as a result of City of Naperville building code requirements added to the drawings under revision date: 11-14-72."

It argues that the trial court misconstrued this letter as indicating that the Naperville changes were added to the 11-14-72 drawings; whereas, the proper interpretation is that the changes were embodied in the 11-14-72 revisions and were required because the original plans covered by the warranty were defective.

We think that this elaborate argument of plaintiff is untenable. First, plaintiff has shown us nothing to indicate that the trial court based its finding on the fact that the building code deficiencies were not in the original, warranted, site plan. Plaintiff has directed us only to a portion of the trial court's opinion prior to the first appeal, which seems to be of little significance here, as the trial judge made no finding as to damages at that time. Second, there is no indication that the trial judge's conclusion in that initial opinion was based on the letter from Mars Construction. In fact, we note this letter was admitted into evidence for the limited purpose of showing that Fanslow had inquired into the cost of the Naperville items, and it is thus not likely that the trial judge relied on the letter to determine

which set of plans necessitated the changes. In light thereof, we conclude that the record does not support plaintiff's contention that the trial court erred in refusing to allow costs for the Naperville items.

Plaintiff lastly contends that the trial court erred in denying an award of prejudgment interest, to which it argues entitlement under the following statute:

"Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; * * *." (Ill. Rev. Stat. 1977, ch. 74, par. 2.)

While a contract for the sale of realty qualifies as an "instrument of writing" under the statute (*Vandercook v. Mayer* (1938), 297 Ill. App. 311, 17 N.E.2d 542), in order for prejudgment interest to be awarded the damages must be liquidated or subject to exact computation (*Central National Chicago Corp. v. Lumbermens Mutual Casualty Co.* (1977), 45 Ill. App. 3d 401, 359 N.E.2d 797). In *Martin v. Orvis Brothers & Co.* (1974), 25 Ill. App. 3d 238, 251, 323 N.E.2d 73, 83, it was explained:

"For interest to attach, prior to judgment, absent an agreement, the amount must be fixed, or determinable, and due, in the sense that a debtor-creditor relationship has come into being. [Citation.] If the amount is determinable, interest can be awarded on money payable even when the claimed right and the amount due require legal ascertainment [citation], and the fact that the parties could reasonably differ as to their liability is not a consideration so far as the statute is concerned."

In this regard, it has been held that where damages are computed by subtracting the contract price from market value, they are sufficiently ascertainable to justify an award of prejudgment interest. For example, in *Keystone Steel & Wire Co. v. Price Iron & Steel Co.* (1952), 345 Ill. App. 305, 103 N.E.2d 143, plaintiff and defendant entered into an agreement whereby plaintiff was to purchase scrap steel from defendant. When defendant failed to deliver, plaintiff brought a successful action for breach and also was awarded prejudgment interest. On appeal, this court rejected defendant's argument that damages were not subject to exact computation, stating: "The contract was in writing and the damages were ascertainable by computation of the difference between the contract price and the market price * * *. Interest is properly allowed in such cases." 345 Ill. App. 305, 315, 103 N.E.2d 143, 148 (quoting *Norton Iron Works v. Wilson Steel Products Co.* (1924), 232 Ill. App. 523, 531).

We see the instant case as presenting a distinguishable situation, however. In *Keystone Steel* and *Norton Iron Works*, the contract price was fixed and not disputed; whereas, here the contract price was sharply disputed since it was contingent upon which credits were allowed and for

what amount, and the market value of the property was also disputable. Furthermore, the significant difference between the amount demanded in plaintiff's amended complaint ($197,069.71) and the trial court's amended judgment of $154,202.76 is further indication that the amount due was not readily ascertainable. (See Williams, *Prejudgment Interest: An Element of Damages Not To Be Overlooked*, 22 Trial Lawyer's Guide 4, 6 (1978).) In view of the above, we do not believe the damages were so certain or definite as to fall within the statute (*Dady v. Condit* (1904), 209 Ill. 488, 70 N.E. 1088) and cannot say that the trial court abused its discretion in denying prejudgment interest.

For the reasons stated above, the judgment of the trial court awarding plaintiff $154,202.76 in damages for anticipatory breach of contract is affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.