HORTON INDUSTRIAL, INC., Plaintiff-Appellee, v. THE VILLAGE OF
MOWEAQUA, Defendant and Counterplaintiff-Appellant (The Environmental Protection Agency, Intervening Defendant and Counterplaintiff-Appellant).

Fifth District   No. 5—83—0845

Opinion filed April 21, 1986.

Neil F. Hartigan, Attorney General, of Springfield (Jill Wine-Banks, Solicitor General, and Greig R. Siedor, Assistant Attorney General, both of Chicago, of counsel), for appellant Illinois Environmental Protection Agency.

James Gollings, of Gollings & Gollings, of Decatur, for appellant Village of Moweaqua.

Dailey & Walker, of Granite City, for appellee.

PRESIDING JUSTICE KASSERMAN delivered the opinion of the court:

Defendants, village of Moweaqua and the Illinois Environmental Protection Agency (IEPA), an intervening defendant, have perfected this appeal from a judgment entered in the circuit court of Shelby County in a jury trial in which defendant village was found to have committed a breach of its sewer construction contract with plaintiff, Horton Industrial, Inc. The facts are as follows:

During the spring of 1977, the defendant village requested bids upon a proposed sewage collection system which was being partially funded by defendant IEPA. Of the four contractors bidding upon this project, the low bid of $1,288,132.30 was submitted by plaintiff, which at the time was doing business as Lord & Rowe, Inc. After the village accepted plaintiff's bid, the village and plaintiff entered into a contract consisting of the following relevant provisions:

"SCOPE. Division B (Sewage Collection System) herein described as specified is the first proposed complete sanitary sewer system for Moweaqua, Illinois. It will replace the many septic tanks, cesspools, underground leaching areas, field tiles, drains and storm sewers serving as outlets for the partially treated domestic sewage, etc.

* * *

The entire risk as to the nature of any and all subsurface material characteristics encountered at the various levels is that of the Bidder. No additional compensation is available. The Bid-

der's claims for additional compensation due to encountering subsurface conditions different than that expected will be denied. The only exception to the above is material which could be classified as 'Rock Excavation.' None is expected at Moweaqua.

\* \* \*

The plans show the general alignment of the various underground utility lines, existing drains and storm conduits based on the information available, approximate location picked up during field surveys and data from the private utility companies and Village records. They cover a very large percentage of underground utility lines and conduits. Bidders will be required to locate other underground utilities by any other available means during construction.

\* \* \*

The location of any field tile, underground conduit, buried cables, if any not shown on the Plans [Exhibit E1] shall be called to the attention of the Engineer. All such facilities, if damaged, shall be restored, and approved by the Engineer before backfilling the location. No extra compensation will be allowed for this work or for delays occasioned by it.

\* \* \*

Any discrepancies found between the DRAWINGS and SPECIFICATIONS and site conditions or any inconsistencies or ambiguities in the DRAWINGS or SPECIFICATIONS shall be immediately reported to the ENGINEER, in writing, who shall promptly correct such inconsistencies or ambiguities in writing. WORK done by the CONTRACTOR after his discovery of such discrepancies, inconsistencies or ambiguities shall be done at the CONTRACTOR'S risk.

\* \* \*

The OWNER shall furnish all land surveys and establish all base lines for locating the principal component parts of the WORK together with a suitable number of bench marks adjacent to the WORK as shown in the CONTRACT DOCUMENTS.

The ENGINEER shall act as the OWNER'S representative during the construction period. He shall decide questions which may arise as to quality and acceptability of materials furnished and WORK performed. He shall interpret the intent of the CONTRACT DOCUMENTS in a fair and unbiased manner. The ENGINEER will make visits to the site and determine if the WORK is proceeding in accordance with the CONTRACT DOCUMENTS.

\* \* \*

The CONTRACTOR will be held strictly to the intent of the CONTRACT DOCUMENTS in regard to the quality of materials, workmanship and execution of the WORK.

\* \* \*

Wherever obstructions are encountered during the progress of the work and interfere to such an extent that an alteration in the plan is required, the Engineer shall have the authority to change the plans and order a deviation from the line and grade or arrange with the owners of the structures for the removal, relocation or reconstruction of the obstructions. Where gas, water, telephone, electrical, hot water, steam or other existing utilities are an impediment to the vertical or horizontal alignment of the proposed pipe line, the Engineer shall order a change in grade or alignment or shall direct the Contractor to arrange with the owners of the utilities for their removal. If a change in line or grade of a sanitary sewer is necessary, the Engineer will order the addition of any manholes needed to comply with the Environmental Protection Agency regulations.

\* \* \*

If, through no act or fault of the CONTRACTOR, \*\*\* the ENGINEER fails to act on any request for payment within thirty (30) days after it is submitted, \*\*\* then the CONTRACTOR may, after ten (10) days from delivery of a WRITTEN NOTICE to the OWNER and the ENGINEER, terminate the CONTRACT and recover from the OWNER payment for all WORK executed and all expenses sustained. \*\*\*

\* \* \*

At least ten days before each progress payment falls due (but not more often than once a month), the CONTRACTOR will submit to the ENGINEER a partial payment estimate filled out and signed by the CONTRACTOR covering the WORK performed during the period covered by the partial payment estimate and supported by such data as the ENGINEER may reasonably require. If payment⁻ is requested on the basis of materials and equipment not incorporated in the WORK but delivered and suitably stored at or near the site, the partial payment estimate shall also be accompanied by such supporting data, satisfactory to the OWNER, as will establish the OWNER'S title to the material and equipment and protect his interest therein, including applicable insurance. The ENGINEER will, within ten days after receipt of each partial payment esti-

mate, either indicate in writing his approval of payment and present the partial payment estimate to the OWNER, or return the partial payment estimate to the CONTRACTOR indicating in writing his reasons for refusing to approve payment. ***"

At trial, Louis Hazlett testified that he was plaintiff's project superintendent through May 11, 1978. On September 7, 1977, Hazlett "started up" the project (*i.e.*, contacted city officials, project engineers, and suppliers). Almost immediately, Hazlett noticed that the surveying work had not been done. Hazlett explained that surveying must be done before the laying of a sewer line because it is the only accurate way to determine the slope of the land for the unimpeded flow of sewage and the location of the required manholes and lift stations. Since manholes and lift stations are manufactured off-site in accordance with the needs of the particular location at which they will be placed, and since the manufacturing process takes slightly more than one week, the survey must be done at least two weeks prior to construction in a given area so as not to delay construction. The lack of a proper survey delayed the beginning of the project by one week. However, according to Hazlett, the lack of a proper survey continued to plague plaintiff throughout construction.

Shortly after construction began, Hazlett encountered what he termed drainage tile collection "systems" which were in direct conflict with the proposed sewer line. Hazlett testified that although resident inspectors are ordinarily given authority to approve restoration of existing lines and minor changes in location of sewer lines, the project engineer in the present case expressly disapproved of the initiative shown by the resident inspector and the contractor in dealing with restoration and relocation. Nevertheless, Hazlett never received any definitive instructions from the engineer as to approved alternative restorations of existing lines and locations for new lines. Due to these problems, according to Hazlett, construction crews often were forced to change the locations of their construction activities. The delays in construction caused by relocation of the construction crews were often exacerbated by the lack of a proper survey of the new location.

Wayne Hellemeyer, vice-president of the sewers and sewage treatment plant division of S. M. Wilson Company (of which plaintiff is a subsidiary), testified that he had prepared approximately 200 bids upon sewer-related projects. According to Hellemeyer, the original bid documents indicated that there were hundreds of feet of existing drainage tile; however, thousands of feet of drainage tile were later encountered on the project which were not shown on the plans. In Hellemeyer's opinion, the original bid documents did not show a very large percent-

age of existing drainage tile. John Hines, a registered engineer and vice-president of civil engineering projects for Hanson Engineers, testified that the original bid documents did not show a drainage system in the village alleys. In Hines' opinion, the existence of such a system would be significant to a contractor preparing his bid. John Gee, a registered engineer, testified that field tile is quite prevalent in the Moweaqua area and that records regarding the location of such tile are generally nonexistent. However, an ordinance of the defendant village dated July 12, 1971, provided that a permit was required to tap into storm tiles on village property because "many tile taps have been improperly made, without the knowledge or inspection by village officials or the payment of tapping fees."

During early December 1977, Hazlett and John Burress, plaintiff's president, met with the village and IEPA officials and the project engineer. During these meetings, the problems with repair and maintenance of existing tile and with conflicts between existing tile and new sewer lines were discussed. According to Hazlett and Burress, these meetings produced no equitable solutions. Consequently, construction halted on December 15, 1977.

Throughout the winter and early spring, plaintiff continued communicating with village officials in an attempt to resolve the problems it perceived in the project. During these communications, plaintiff requested additional time and money for completion of the project due to the presence of a drainage tile "system" not shown in the construction plans. Although plaintiff received no response to its requests for additional time and money, the village, at its own expense, located a large amount of underground drainage tile which was not present in the original construction plans. The results of this work were presented to plaintiff sometime prior to mid-May 1978.

On April 4 and April 18, 1978, the construction log kept by Hazlett shows that he was attempting to get a survey crew working so that the project could be lined out and materials ordered. From April 18 through May 11, 1978, Hazlett helped unload two of the three lift stations for the project. On or about May 11, 1978, plaintiff ceased active construction operations in the village. Very little construction was completed by plaintiff during 1978.

After ceasing active construction operations, plaintiff continued in its attempt to receive additional time and money for completion of the project. On or about June 1, 1978, plaintiff was informed that effective immediately the engineering firm in charge of the project was being replaced by a firm as yet unnamed. Approximately one month later, plaintiff was given the name of the new engineering firm. After meet-

ing with representatives of the new engineering firm at a July 18, 1978, village board meeting, an unpaid pay estimate sent to the engineering firm on or about June 6, 1978, was brought to the firm's attention by plaintiff. Although there was some dispute as to certain items in the bill, no written response to this bill was received from the engineering firm.

Having received no written response to its pay estimate, plaintiff informed the engineering firm and the village in a letter dated September 1, 1978, of its intention to terminate the contract. On September 18, 1978, the engineering firm sent plaintiff written notice of why the disputed pay estimate had not been paid. In spite of the engineering firm's response, plaintiff terminated the contract.

After terminating the contract, plaintiff filed an action for breach of contract against the village, the first engineering firm on the project, the first project engineer, and certain village officials. At trial, plaintiff alleged that a breach in the contract existed in one or more of the following aspects: (1) the project engineer failed to issue change orders (*i.e.*, orders allowing for additional monetary compensation) for subsurface or latent physical conditions differing materially from those indicated in the contract documents, or for unknown physical conditions at the site of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in the work of the character provided in the contract; (2) by expressly stating that a very large percentage of underground utility lines and conduits were shown in the plans when in fact they were not; (3) by failing to timely furnish surveys and base lines; (4) by failing to decide questions as to quality and acceptability of work performed, or to promptly interpret contract documents; and (5) by failing to promptly pay, in whole or in part, the pay estimate dated June 6, 1978. The defendant village filed a counterclaim for breach of contract against plaintiff because it failed to complete the construction project.

The case was tried before a jury. At defendant's request and over plaintiff's objection, the trial court gave defendant's instruction No. 11 regarding the interpretation of the contract documents. This instruction stated:

> "I have ruled in this case that the contracts between the Village of Moweaqua and Horton Industrial, Inc. *** are unambiguous. Therefore, you may consider only the language of these contracts, and no other evidence, in determining the intention of the parties to these contracts."

However, the trial court refused defendant's instruction No. 10 regarding the interpretation of the contract documents. Instruction No. 10

stated:

> "The Court has ruled as a matter of Law that the contract documents place on the contractor the responsibility of maintaining, repairing, or replacing all existing underground utilities encountered during construction, whether shown or not shown on the plans, without additional compensation for such maintenance, repair or replacement."

The jury found in favor of plaintiff and against the defendant village. Damages for breach of the contract were assessed at $143,578.29. The defendants appeal from this verdict, contending that the plaintiff's claim must fail as a matter of law because the contract was unambiguous and provided that it was plaintiff's responsibility, without additional compensation, to repair, maintain, or replace all underground utilities encountered during construction, whether shown in the plans or not. Furthermore, defendants urge that the trial court's refusal to so instruct the jury was reversible error.

We first note that the instant contract, which the trial court ruled· was unambiguous, at defendant's request, contains two basic provisions relating to subsurface conditions. The first of these provisions states that the bidder bears the entire risk as to any and all subsurface conditions except the excavation of rock. Furthermore, the contract provided that the responsibility for and expense of restoring existing underground utilities not shown in the plans is also placed upon the bidder. However, the second of these provisions is limited by a representation by defendant village in the contract that "a very large percentage" of utility lines and conduits were shown in the plans and specifications.

The defendants contend on appeal that the jury should have been specifically instructed as to plaintiff's responsibilities under the above provisions because the contract "unambiguously" stated that plaintiff was to bear the risk of such underground structures. Plaintiff, on the other hand, urges that the village was guilty of a breach of the contract on the basis of the second of the above provisions because the plans failed to show a very large percentage of existing utility lines and conduits as it was represented they did.

■ The court's determination, at defendant's request, that the contract was not ambiguous invokes the provisions of the parol evidence rule. By operation of this rule, if parties intend that a written instrument alone is to constitute the complete agreement between them or if the instrument states that it alone is to constitute the entire agreement between them or if the instrument itself appears complete, certain, and unambiguous, then parol evidence of a prior or contempo-

raneous agreement is inadmissible to vary the terms of that instrument. The limits to the parol evidence rule are stated in the rule itself. Furthermore, the rule excludes parol evidence only when a court first determines that the instrument is or was intended to be the complete and unambiguous agreement of the parties. (*Ireland v. Esposito* (1981), 93 Ill. App. 3d 584, 590, 417 N.E.2d 738, 743.) Since both parties in the instant appeal agree that the contract is not ambiguous, defendant's instruction No. 11, which instructed the jury that it was to consider only the language of the contract in determining the intentions of the parties, was proper.

■ It is well settled that the construction of a contract is a pure question of law which a court must determine from the clear language of the documents. (*Vigilante v. National Bank* (1982), 106 Ill. App. 3d 820, 823, 436 N.E.2d 652, 655.) However, the issue as to whether a breach of contract has occurred is a question of fact, and the judgment of the trier of fact thereon will not be disturbed unless it is clearly against the manifest weight of the evidence. (*Cf. Farwell Construction Co. v. Ticktin* (1980), 84 Ill. App. 3d 791, 803, 405 N.E.2d 1051, 1060.) We recognize that a trial court should, as a matter of law, rule upon such matters as contractual interpretation when the facts are not in dispute; however, we also recognize that a determination by the trier of fact is required when a question as to proper interpretation of a contract requires the determination of a question of fact, unless the evidence is so clear that no reasonable man would disagree as to the determination of the issues before the court. *Cf.* Corbin, Contracts sec. 554, at 222-23 (1960).

In the case at bar, one contractual specification was that plaintiff, at its own expense, would be responsible for repairing and maintaining any existing drainage tile encountered during construction, whether shown or not shown in the plans. On the other hand, although the contract made plaintiff aware that the sewer system it was installing was meant to replace existing outlets for partially treated domestic sewage, it also purported to make plaintiff aware of "a very large percentage" of underground utilities and conduits. The evidence adduced at trial was in conflict as to whether the defendant village should have known of and disclosed the existence of a field tile sanitary sewage system. The record establishes that the trial court was well aware of this controversy between the parties regarding existing underground field tile not shown by the plans and specifications. Defendants urged that the contract expressly provided that plaintiff was responsible for all existing field tile while plaintiff asserted that such field tile constituted a large, complex underground sanitary sewer system, unknown

to it and not disclosed by the plans and specifications. The evidence of record indicates that a sewage system had been developed over a period of years as a result of the installation of field tile to dispose of sewage rather than surface drainage. In its remarks to counsel, the trial court displayed a complete knowledge of this controversy and an appreciation of the consequences of its ruling. This is evidenced by the fact that when requested by counsel for defendants to rule that the contract precludes plaintiff from "[s]aying that he [plaintiff] doesn't have to replace field tile, period," the court declined to do so. In so doing, the trial court was concluding, as a matter of law, that the underground field tile in question could no longer be considered to be performing the customary function of field tile to remove surface water but instead had become a sewer system which, if not disclosed by the contract plans and specifications, may or may not have prevented the contract from disclosing a "very large percentage" of existing underground utilities. The trial court therefore correctly refused to adopt the interpretation of the contract sought by defendants that the contract precludes plaintiff from contending that it was not obligated to replace all field tile regardless of any evidence regarding the location and extent of such sanitary sewer system.

■ Accordingly, the trial court properly permitted the issue to go to the jury as a question of fact. We therefore reject defendant's assertion that the trial court abdicated its responsibility to construe the contract by not ruling in defendant's favor on this point as a matter of law.

■ It is well settled that it is the jury's function to evaluate the weight of the evidence and to assess the credibility of the witnesses; and a reviewing court will not disturb a jury's findings unless the verdict is palpably erroneous, an opposite verdict is clearly compelled, or the findings are unreasonable, arbitrary and not based upon the evidence. (*Bass v. Washington-Kinney Co.* (1983), 119 Ill. App. 3d 713, 728, 457 N.E.2d 85, 97.) In this regard, the unambiguous language of the contract provided that the engineer will, within 10 days after receiving a partial pay estimate from plaintiff, "either indicate in writing his approval of payment and present the partial pay estimate to the owner, or return the partial pay estimate to the contractor indicating in writing his reasons for refusing to approve payment." The contract further provides that "[i]f, through no act or fault of the contractor, the engineer fails to act on any request for payment within thirty (30) days after it is submitted, then the contractor may, after ten (10) days from delivery of a written notice to the owner and the engineer, terminate the contract and recover from the owner for all work executed

and all expenses sustained." The evidence adduced at trial establishes that plaintiff submitted a partial pay estimate on June 6, 1978, and that no written response or payment was received.

On September 1, 1978, plaintiff sent a letter to the defendant village (owner) and the engineer, notifying them of its intention to terminate the contract in accordance with these provisions. Plaintiff did not receive a response to this letter until September 18, 1978, which is eight days after the 10-day waiting period required before terminating the contract; therefore, plaintiff was entitled to terminate the contract.

Furthermore, sufficient evidence is present in the record to support the jury's finding that defendant village violated its contract with plaintiff in other ways. It is uncontradicted that surveying work for which the defendant village was responsible was often incomplete. Although other problems for which the defendant village was not responsible may have contributed to plaintiff's construction delays, the evidence shows that the lack of a proper survey was present throughout construction and that some of the delay experienced by plaintiff was due to the defendant village's failure to provide surveys in advance of construction. The record also indicates that the defendant village's agent, the engineer, failed promptly to respond to plaintiff's requests for approval of restoration work and the relocation of new sewer lines which were in direct conflict with existing drainage tile. Since the liability for improperly restored or relocated lines without the engineer's approval was solely the contractor's responsibility under the contract, the contractor's request that the engineer respond to these inquiries was reasonable. Moreover, since the defendant village passed an ordinance in 1971 in which it acknowledged a widespread, ongoing practice of individuals improperly tapping into the village storm sewer, and since there was testimony that thousands of feet of existing drainage tile were not shown in the original bid documents, there is sufficient evidence to support a finding that the defendant village failed to disclose a very large percentage of underground utility lines and conduits in its plans and specifications.

For the foregoing reasons, the judgment of the circuit court of Shelby County is affirmed.

Affirmed.

KARNS and WELCH, JJ., concur.